**Benny PENA, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

**No. 88–243.**

Supreme Court of Wyoming.

Sept. 14, 1989.

Leonard Munker, State Public Defender, Cheyenne, Wyoming Defender Aid Program, Gerald M. Gallivan, Director, Darrell V. Goodman, Student Intern, Laramie, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Sr. Asst. Atty. Gen., Sandra J. Espy, Student Intern, Cheyenne, for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

GOLDEN, Justice.

On appeal from his conviction for felony assault of a police officer, in violation of W.S. 6–5–204(b), appellant Benny Pena (Pena) claims it was error for the trial court to allow into evidence the testimony of six police officers relating to prior bad acts of Pena involving altercations with the police officers when his defense was a denial of the offense. We affirm.

## FACTS

Sometime in the early morning hours of January 30, 1988, a Cheyenne taxi driver called the Cheyenne Police Department to report a truck stuck in a snow bank in the area of 5th and Deming Streets. At approximately 4:45 a.m. Cheyenne Police Officer Phil Brown was dispatched to the area to investigate a "possible drunk driver stuck in the snow." Upon arriving at the scene, Brown realized that the truck had been removed from the snowbank and moved a block away to the 500 block of Thomes, where he saw a person, later identified as Pena, standing in the street next to the truck. Brown pulled up behind the truck and ordered Pena to move to the side of the street so that he could talk to him because he appeared drunk.

At this point the driver of the truck drove to the end of the street, made a U-turn and parked the truck on the opposite side of the street. Conforming with his police training, Brown started to follow

the truck so that he could be parked behind it. As he was driving down the street Brown looked in his rear-view mirror and saw Pena running at "full speed, arms waving, towards the front door of his house." Brown immediately threw his car into park, grabbed his baton and started to pursue the fleeing Pena.

As Brown entered the yard of the house to which Pena was running, an individual standing in the yard, later identified as Pena's brother Larry, kicked Brown so hard in the kneecaps that he fell to the ground. Brown got up and chased Larry into the street, where Larry slipped bringing Brown down on top of him. As Brown was holding Larry down on the ground with his baton in an attempt to arrest him, Pena struck a hard blow to Brown from behind throwing Brown over the top of Larry. Brown immediately got up, turned around and saw Pena who began to punch Brown. Still holding on to Larry, Brown made a sweeping motion with his baton in Pena's direction in an attempt to stop Pena's attack. During the scuffle, Brown was hit repeatedly in the face, chest and arms by Pena.

A third person arrived to join Pena in the assault on Brown. While trying to fend off these attackers, Brown was struck on the side of his head from the other side by Larry who was still being held by Brown. Larry then began to wriggle out of the jacket Brown was holding onto and, with the aid of Pena and the third person, successfully freed himself and the three ran into the house, leaving Brown in the street with the jacket.

Rather than pursue the three, Brown called for backup. Leaving the jacket in the street, Brown then approached the house and was confronted on the porch by another of Pena's brothers, John, and the third person in the assault. Brown attempted to enter the house but was pushed off the porch by John. Brown made another attempt but was swung at several times by the third person and told that he would not be allowed to enter without a warrant. About this time a backup officer Mark Allsop arrived. As Allsop walked toward the house amidst the yelling and screaming of John and the third person, Pena's mother Delores Valdez came out onto the porch and screamed at the officers that they could not enter the house without a warrant. From the porch Brown and Allsop could see into the house and Allsop identified the occupants and assailants of Brown as Pena and his brother Larry based on previous contacts Allsop had had with them.

At that time Brown ran around to the back of the house and saw two unidentified people running away from the house whom he chased for a short distance. Brown returned to the front of the house; as he did so, the third person retrieved the jacket from the street and a struggle over the jacket ensued between Brown, the third person and Delores Valdez. Meanwhile, Pena reappeared on the porch wielding a baseball bat over his head. Allsop raised his baton in defense; Pena yelled and ran back inside the house. More backup officers arrived and John and the third person were arrested. Brown, Allsop and a third officer entered the house and saw Pena and Larry run out the back door; they were later arrested and charged with felony assault of a police officer in violation of W.S. 6-5-204(b).

A consolidated trial of Pena and Larry was held on May 23–26, 1988. A key issue at trial was the identity of the individual who fought with Brown in the street. Delores Valdez testified that the coat Brown alleged Larry had on during the struggle belonged to Pena and that it was in fact Pena that Brown had initially been fighting with in the street instead of Larry, who was in the house with her. She further testified that it was Brown who initiated the attack, not Larry or Pena, that she saw no one strike Brown, and that any actions taken by Larry or Pena were in self defense. In rebuttal the state introduced the testimony of six local law enforcement officers about several previous altercations involving Pena and the officers. After a discussion in chambers, and over the continuing objection of defense counsel, the court admitted this testimony for the purpose of proving intent. A limiting instruc-

tion was given to the jury and reiterated before each rebuttal officer testified.

At the close of trial the jury found Pena guilty; Larry was found not guilty. On August 1, 1988, Pena was sentenced to a term of one to two years in the penitentiary. This appeal followed.

## ANALYSIS

### *W.R.E. 404(b)*

Pena argues on appeal that the six officers' testimony was improperly admitted under W.R.E. 404(b), which provides:

> *Other crimes, wrongs or acts.*—Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This rule operates to ban the use of evidence of a person's character in order to establish that the person's behavior on a particular occasion was in conformity with his character. *Ortega v. State*, 669 P.2d 935, 943 (Wyo.1983). Such evidence may, however, be admissible for other purposes. *Trujillo v. State*, 750 P.2d 1334, 1336 (Wyo.1988); *Coleman v. State*, 741 P.2d 99, 103 (Wyo.1987); *Brown v. State*, 736 P.2d 1110, 1112–14 (Wyo.1987); *Ortega*, 669 P.2d at 943. This court has adopted a rather liberal attitude toward admitting evidence of other crimes, wrongs or acts if it constitutes proof of one of the purposes in accord with Rule 404(b). *Marker v. State*, 748 P.2d 295, 297 (Wyo.1988); *Carey v. State*, 715 P.2d 244, 248 (Wyo.1986). On appeal, deference is given to a trial court's determination concerning the admissibility of evidence under Rule 404(b); as long as there is a legitimate basis for a court's decision we cannot say that there was an abuse of discretion. *Trujillo*, 750 P.2d at 1336; *Noetzelmann v. State*, 721 P.2d 579, 581 (Wyo.1986); *Carey*, 715 P.2d at 247; *Bishop v. State*, 687 P.2d 242, 244 (Wyo. 1984) *cert. denied* 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985); *Ortega*, 669 P.2d at 944; *Hatheway v. State*, 623 P.2d

741, 743 (Wyo.1981); *Vasquez v. State*, 623 P.2d 1205, 1208 (Wyo.1981).

When reviewing the admission of prior bad acts evidence, this court has adhered to a five factor test, the Bishop test. *Trujillo*, 750 P.2d at 1337. The five factors we have considered are whether:

> (1) The proof of the other similar crimes is plain, clear and convincing.
>
> (2) The other crimes are not too remote in time from the charged offense.
>
> (3) The evidence of the other crimes is introduced for a purpose sanctioned by Rule 404(b) of the Federal Rules of Evidence [W.R.E. 404(b)].
>
> (4) The element of the charged offense that the evidence of other crimes is introduced to prove is a material issue in the case.
>
> (5) There is a substantial need for the probative value of the evidence of the other crimes. *United States v. Myers*, 550 F.2d 1036, 1044–1045 (5th Cir.1977).

First adopted in *Coleman*, 741 P.2d at 104 and again in *Bishop*, 687 P.2d at 246. While not controlling of a trial court's discretion, these factors are helpful in our determination of the propriety of the admissibility of prior bad acts evidence, keeping in mind that not all factors need be present to uphold a trial court's admission of evidence. *Coleman*, 741 P.2d at 105; *Story v. State*, 721 P.2d 1020, 1032 (Wyo. 1986), *cert. denied* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986).

## INTENT

The testimony of the six officers admitted into evidence related various altercations occurring between themselves and Pena. It is not necessary to detail the particulars of each officer's testimony. Suffice to say, the testimony related a series of altercations in which Pena had exhibited great hostility toward the officers. His actions included: kicking at an officer who had merely approached the scene of a scuffle between Pena and another officer; attempting to hit an officer through the open window of the officer's patrol car after leaving the scene of an accident when

the officer requested that he return to the scene; threatening an officer, assuming a fighting stance and swinging at the him after he had stopped Pena for speeding on a motorcycle; resisting arrest so vigorously after a fight in a bar that it took three officers to restrain him, handcuff him and place him in the patrol car, after which, Pena kicked out the window of the patrol car, kicked an officer in the chest and finally had to be placed in leg irons; and resisting arrest and unsuccessfully fleeing upon being informed that he was to be arrested under an active arrest warrant. This evidence suggested that Pena was the first aggressor in the altercations with the officers, who were lawfully performing their official police duties.

During an in-chambers conference the trial court determined that the six officers' testimony was admissible in rebuttal for the purpose of proving Pena's intent to assault Brown. The trial court expressed its reasons for admission of the evidence in the following statement:

THE COURT: Let me tell you what I'm going to do here. First of all, Mr. Apodaca made a statement to the effect that [Pena] and Larry were simply struggling to get free, and that to me means that the defendants were not motivated, at least by the argument, not motivated by an intent to do harm. This altercation, therefore, was not motivated by an intent to do harm by Larry and [Pena], but an intent to simply struggle to get free. Perhaps it's even self defense.

Now, the Jury is going to be instructed that the state has the burden of proof, that the conduct of the defendants was an intentional act with the intent to do harm to this individual, an intent to cause bodily harm, bodily injury.

Now, Mr. Apodaca testified, and I think the inference could be drawn, regardless of the type of harm, that testified to by the officer, that that was not the product of a mind with intent to do harm, but the intent of a mind simply struggling to get free.

You could also argue that the defense has projected a picture where the defendants are peaceloving individuals.

They're not possessed of any frame of mind demonstrating ill will towards the police, but rather they were out there in a peaceful manner, trying to prevent the abuse of excessive force by Officer Brown.

That's how I view one aspect of the defense in this particular case, and because intentions are a central issue to the State's burden, for that reason I'm going to allow that testimony to come in under 404(b) as circumstantial evidence of proof of the intent that these individuals possessed.

When relating the *Bishop* factors to this record, it discloses, first, that the officers' testimony, describing a series of altercations between themselves and Pena, was clear and convincing. We have noted that as a predicate to the introduction of extrinsic acts, "the prosecution must establish that the defendant committed them." *Bishop*, 687 P.2d at 246. While proof of identity need not be proven beyond a reasonable doubt, a prima facie case is necessary in order for the extrinsic acts to be admissible. *Id.*

Second, the altercations were not so remote from the offense charged to foreclose their admission into evidence. The oldest altercation introduced into evidence occurred less than seven years before the present charged offense, and the latest just one year before the present offense. "[Q]uestions concerning remoteness of evidence are left to the sound discretion of the trial court and subject to challenge and disturbance only for clear abuse." *Goodman v. State*, 601 P.2d 178, 184 (Wyo.1979) (eight years between prior bad act and charged offense not too remote). See also *Elliott v. State*, 600 P.2d 1044, 1048 (Wyo. 1979) (three years not too remote). Given the nature of the altercations testified to, seven years is not too remote. Even were we to hold otherwise—that seven years is too remote—remoteness in time of a prior incident is rarely, standing alone, determinative of the admissibility of prior bad acts evidence; rather, it is merely one factor to be considered in determining the question of relevancy. *Elliott*, 600 P.2d at 1048.

The testimony was admitted for the purpose of proving intent. Intent is one of the enumerated exceptions to Rule 404(b), thus fulfilling the third factor of the Bishop test. It is also one of the elements to be proved beyond a reasonable doubt in the crime of felony assault of a police officer, as proscribed by W.S. 6–5–204(b).[1] As such, intent is a material issue in this case, as required under the fourth Bishop factor. This court has recognized that "evidence is not to be excluded because it tends to show the commission of other offenses 'where it tends to prove facts material in the trial.'" *Crozier v. State*, 723 P.2d 42, 49 (Wyo. 1986) (quoting *Valerio v. State*, 429 P.2d 317, 318 (Wyo.1967)). Finally, intent being an essential element of the crime charged, the testimony's probative value as to intent is manifest. See *Scadden v. State*, 732 P.2d 1036, 1044 (Wyo.1987) (where testimony is relevant to proving an element of the crime, its probative character justifies its introduction); and *Coleman*, 741 P.2d at 103 (suggesting that prior bad acts evidence "be ruled inadmissible unless it can be shown by the prosecution that it is essential to the proof of an element of the crime allegedly committed by the accused and, indeed, that its use in this sense not be merely cumulative." M. Berger, 2 *Weinstein's Evidence*, ¶ 404[10] at 404–73–404–74 (1978)). Here, where Pena argued that Brown was the aggressor, that Pena acted only in self defense, and where this defense was corroborated by defense witnesses, the officers' testimony was critical as rebuttal evidence on the issue of intent, an essential element of the crime, and was not merely cumulative of other evidence presented.

This court has previously held that evidence of prior bad acts is admissible for the purpose of proving intent. *Trujillo*, 750 P.2d at 1336; *Noetzelmann*, 721 P.2d at 582; *Goodman*, 601 P.2d at 181.[2] In *Trujillo*, the appellant, a trained boxer, was charged with aggravated assault when his punch broke the victim's jaw. The court recognized that the pivotal question in the trial was whether he broke the victim's jaw "'intentionally, * * * under circumstances manifesting extreme indifference to the value of human life * * *'" under § 6–2–502(a)(i) so that aggravated assault was proven beyond a reasonable doubt." *Id.* at 1337. In so recognizing, the trial court permitted the introduction of evidence of a fight occurring between the appellant and another person one hour before he broke the victim's jaw for the purpose of proving intent. This court affirmed the trial court's decision holding that the evidence was relevant on the issue of intent and finding that its probative value outweighed its prejudicial effect. *Id.*

In *Goodman*, Goodman had been found guilty of manslaughter for shooting a pregnant woman; his defense to the charge was that the shooting had been an accident. During trial, the prosecution, through a series of cross examination questions, elicited testimony from Goodman regarding a similar shooting incident that had occurred some eight years before the shooting in question. In that earlier incident, Goodman had immediately reported the shooting; in the later case, Goodman made no such report, allowing the victim to die. The state presented the evidence on the theory that it tended to prove Goodman's intent to kill the woman and refuted his theory of accident. The trial court admitted the evidence. This court affirmed the admission stating:

> We consider the evidence to have been relevant in the element of intent which

---

1. W.S. 6–5–204(b) provides:
   (b) A person who intentionally and knowingly causes or attempts to cause bodily injury to a peace officer engaged in the lawful performance of his official duties is guilty of a felony punishable by imprisonment for not more than ten (10) years.

2. Goodman's original conviction for first degree murder for the death of a pregnant woman was reversed and remanded; his conviction for killing an unborn child by assault on the mother was affirmed. *Goodman v. State*, 573 P.2d 400 (Wyo.1977). After remand, Goodman was convicted of manslaughter for the death of the woman and appealed solely from that conviction on the issue of improper admission of evidence under Rule 404(b).

the State was obliged to prove in order to establish murder.

\*     \*     \*     \*     \*     \*

The evidence was probative of appellant's intent at the time the shooting took place. In addition, it served to rebut appellant's claim of accident. Evidence such as that presented here is commonly used for just those purposes.

*Goodman,* 601 P.2d at 181.

A particularly germane definition of "intent," as quoted in *Goodman,* is found in 2 D. Louisell and C. Mueller, *Federal Evidence,* § 140, pp. 224–25 (1985):

3. Intent.

Sometimes loosely defined as "merely the absence of accident," intent in criminal cases is often an element of the charged crime, which clearly encompasses both the desire to achieve a particular end and the knowledge that such an end is the almost-certain result of an act; no doubt intent has many more specific meanings, depending upon the context and the definition of the crime charged. Other acts by the accused, including other crimes, *may be received to prove intent on the common-sense theory that the more often a person acts in a particular way and achieves a particular result, the more likely it is that he intended the result.*

(Emphasis added in *Goodman.*) See also *Grabill v. State,* 621 P.2d 802, 810 (Wyo. 1980).

The evidence introduced through the officers' testimony related a series of altercations in which Pena acted as the aggressor, without provocation, and seemingly for the sole purpose of not cooperating with law enforcement officials. It is unlikely, in light of the overwhelming evidence introduced through the officers' testimony, that Pena would have acted any differently when confronted by Officer Brown. His theory of self-defense in response to Officer Brown's alleged attack is inconsistent with his earlier repeated behavior vis-a-vis police officers. Under *Goodman,* the officers' testimony is relevant for the purpose of showing Pena's intent to do harm in the altercation with Officer Brown. Admitted-

ly, this evidence strikes fairly close to demonstrating a character trait of Pena to fight with police officers. This does not make it inadmissible, however. "It is clear that evidence admissible under Rule 404(b) often tends to implicate the character of the accused, but if the evidence properly is offered for a purpose which is permissible in the light of Rule 402 and 404(b), then it is not excludable simply because it does implicate the character of the accused." *Coleman,* 741 P.2d at 102. See also *Grabill,* 621 P.2d at 809.

## IDENTITY

■ The record also suggests another purpose for which the evidence could properly be admitted. At trial, Delores Valdez testified on defense that it was Pena who had initially been in the street with Officer Brown, not Larry, thus raising the issue of the identity of Officer Brown's assailant. Under the Bishop factors, the officers' testimony was properly admitted for the purpose of showing identity. As discussed above, the proof of the other crimes was clear and convincing and they were not too remote in time to the charged offense. Identity is one of the listed exceptions to the rule. We need cite no authority for the precept that identity is always an element of any crime charged, although it is not always in dispute. As such, it is a material issue in any case, although not always in dispute. Finally, being an element of the crime charged, there is a substantial need for the probative value of the testimony. *Bishop,* 687 P.2d at 246.

■ "As a general rule, it can be said proper evidence to identify the accused as the person who committed the crime is not to be excluded because it tends to prove he was guilty of another and independent crime." *Valerio v. State,* 429 P.2d 317, 318 (Wyo.1967). See also *McCormick on Evidence* § 190, pp. 557–63 (E. Cleary, 3d ed. 1984), where it is stated that evidence that an accused committed a crime other than that for which he is charged is admissible to prove identity. "This is accepted," the author states, "as one of the ultimate pur-

poses for which evidence of other criminal conduct will be received." We reiterate our statement, "evidence is not to be excluded because it tends to show the commission of other offenses 'where it tends to prove facts material in the trial.'" *Crozier*, 723 P.2d at 49.

This court has previously held that evidence of prior bad acts can be admitted for the purpose of proving identity. In *Marker v. State*, 748 P.2d 295 (Wyo.1988), the accused was charged with two counts of aggravated assault with a deadly weapon for cutting the penis of his three year old son. The issue of the identity of the perpetrator of the mutilation was raised when Marker alleged in defense that the boy's mother was to blame for the child's injury. The state then introduced evidence seized in a consensual search of Marker's apartment consisting of three exhibits containing graphic depictions of young boys in various painful sexual situations and describing various torture techniques of boys. The trial court admitted this evidence to show "motive and/or identification," citing *Coleman*, 741 P.2d at 105 (evidence admitted for the stated purpose of proving motive found by this court to lead to an inference of identity, an element of the involved crime).

Identity was also at issue in *Grabill*, where Rule 404(b) was used to allow evidence of prior similar bad acts to be introduced in a child abuse prosecution. This court affirmed the admission finding that the prior bad acts of Grabill were "pertinent to establish by inference * * * who caused the injury." *Grabill*, 621 P.2d at 808. The principal test to be used in the determination of the propriety of the admission of evidence is whether or not the proffered evidence "tends directly to prove or disprove a consequential fact such as intent or knowledge, or whether or not it may tend to establish a proposition such as motive, which through a series of inferences may tend to establish the probability of a consequential fact such as intent or knowledge." *Id.* In affirming the admission, this court acknowledged that the same inference utilized to show intent or knowledge could likewise be used to show identity, which is undeniably as consequential a fact as intent or knowledge. *Id.* at 810.

A decision by the Fifth Circuit Court of Appeals is instructive. In *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977), a bank robbery case, the prosecution attempted to admit evidence of a subsequent bank robbery committed by the accused for the purpose of identifying him as the perpetrator of the robbery in question based on the distinctive *modus operandi* used in each robbery. The court, noting that identity and *modus operandi* are often used synonymously, stated:

The probity of evidence of other crimes where introduced for this purpose depends upon both the uniqueness of the *modus operandi* and the degree of similarity between the charged crime and the uncharged crime. Of course, it is not necessary that the charged crime and the other crimes be identical in every detail. [Citation]. But they must possess a common feature or features that make it very likely that the unknown perpetrator of the charged crime and the known perpetrator of the uncharged crime are the same person. The more unique each of the common features is, the smaller the number that is required for the probative value of the evidence to be significant. But a number of common features of lesser uniqueness, although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together.

*Myers*, 550 F.2d at 1045. "A much greater degree of similarity," the court noted, "between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove state of mind." *Id.* See also *Carey*, 715 P.2d at 248 ("If the issue is identity or modus operandi, the test of substantial relevance for the evidence is higher, because the other acts must also be tied to the defendant."); *Grabill*, 621 P.2d at 811; *Elliott*, 600 P.2d at 1048. Finding the degree of similarity between the charged and un-

charged crimes not great enough, the court in Myers reversed the appellant's conviction. The rule from that case, however, is applicable here.

The similarity of each individual altercation between Pena and the six officers, describing Pena as the aggressor in each case, to the charged offense is insignificant. Yet, considered together, they create an irrefutable inference of identity, suggesting strongly that Pena was the assailant in the charged crime. Moreover, the prior acts are unquestionably tied to Pena. Thus, the evidence was relevant on the issue of identity.

### PREJUDICE

Although relevant for the purpose of proving either intent or identity, the officers' testimony may not be admissible if its prejudicial effect outweighs its probative value. W.R.E. 403. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In *Elliott*, 600 P.2d at 1049, we said:

The function of performing the comparisons required by Rule 403, W.R.E., generally is held to be discretionary with the trial court. The fact that the evidence is detrimental to the defendant is neutral. For the prejudice factor to come into play the court must conclude that it is unfair. *United States v. Dolliole*, 597 F.2d 102 (7th Cir.1979)

Evaluating the evidence in this case in light of our earlier decisions and those of other jurisdictions, we cannot say that the danger of unfair prejudice to Pena outweighs the probative value of the officers' testimony of earlier altercations with Pena. The evidence was properly admitted for the purpose of showing Pena's intent to do harm and to identify him as the assailant of Officer Brown when the assailant's identity was placed in issue. The trial court did not abuse its discretion.

Affirmed.

URBIGKIT, J., files a dissenting opinion.

URBIGKIT, Justice, dissenting.

Trial evidence in this case commenced with an after-hour drinking establishment episode where the ex-girlfriend, as part of an evening of drinking, described how appellant, Benny Pena (Pena), had hit someone with whom she had danced. That introductory character evidence set the stage for the stature of proof subsequently introduced, ostensibly to prove identity, but in reality addressing the jury with the antagonistic and pugilistic character of this convicted defendant.

I dissent not in undue question about the events of an altercation between Pena and one or more police officers during the early morning hours of January 30, 1988, but my disagreement is with proof of guilt by bad acts reputation evidence. This case is particularly forceful in W.R.E. 404(b) over-reaching, since I cannot perceive how Pena's reoccurring problems with the police in prior years proved anything as to who was wrestling with the police officer in the street and who may have hit the police officer from behind. This was the decision to be made by the jury within the directly contradictory evidence. Except that the jury must have ascribed the wrestling match to brother Larry, conflicting evidence defined very little in factual certainty about this early wintertime morning, south Cheyenne residential area fracas.[1]

In stark display, the case presents a vignette where a police officer and a young man were wrestling in the street and ap-

---

1. I have difficulty rationalizing why Pena, who was standing beside his vehicle in the street, should have run when the police car, driven by Officer Brown, pulled up and why Officer Brown then chased Pena, since nothing earlier occurred suggesting a criminal event. In any event, Pena ran, Officer Brown followed, and a general fracas involving a number of citizens and several police officers quickly ensued on the street in front of the Pena residence in the dark hours of that early winter morning.

parently someone hit the police officer "between the shoulder blades."

Q. Now, we were talking about the blow that you received to your back. Would you describe the velocity at which you felt you were hit.

A. I'd say somebody ran into the back of me at full strength. I flew right over the top of Larry. I scrambled up. I still had hold of him with my left arm. I immediately stood up, turned around, heard Benny Pena.

The question for trial was identification of which brother was on the ground and which brother came at the police officer from behind. Both were jointly tried. One was acquitted and the other was convicted of the similarly defined charge of assault on a police officer, W.S. 6–5–204(b). Excluding the introduction of the emotionally charged, although borderline relevant testimony of the ex-girlfriend, the trial moved along in sequence with eye-witness testimony presented by the prosecution and defense in direct conflict as to the identity of the perpetrator of the blow to the back of the police officer and of the individual being held by the officer. In this colloquy, neither Pena nor his brother Larry, as joint defendants, testified.

The State, on rebuttal, presented *seven* witnesses to testify about *five* incidents in prior time between Pena and police officers during the period from 1981 to the date of this occurrence. These incidents involved various argumentative and physical conflicts where both violence and drinking were generally involved. It is fair to contemplate that Pena, when challenged and particularly when drinking, reacted violently to police authority.[2]

The net effect of this course of evidence surely convinced the jury that what happened on January 30, 1988 was not separately significant. It was time for this course of past historical conduct of Pena to end by their immediate power to render a guilty verdict, whether or not Pena was responsible for a criminal offense at this time and during these events. This evidence was particularly devastating when presented in rebuttal after the parade of "men and one woman in blue" left Pena no opportunity to answer what was claimed in factual substance to be the nature of his pugnacious character. Since Pena had not testified, the broad brush of this comprehensively developed *rebuttal evidence* was starkly painted.[3]

I strongly dissent since I remain anchored in historical underpinning of Anglo–American law that conviction of a crime should be determined by the facts of the charged incident and not by the defendant's bad reputation or prior indiscretions that logically provide neither substantial logic nor directed reliable proof of the present charge. By this present decision, the majority finally and totally unhinges Wyoming law from proof of guilt and adopts conviction by emotion, intimation and reputation for punishment of perceived historical bad character. The last residual vestiges of our honored principles of law are dissolved in the corrosion of a W.R.E. 404(b) justification. Not only do we authorize the jury to convict on something other than evidence of guilt, we then follow in

---

2. The presentence investigation report is not in the record, but at sentencing, the trial court commented to Pena:

> I counted your prior incidents with the police, and there are 36 of them. I quite candidly can tell you I've never seen an individual with such a long arrest record. It takes over two and a half pages. Not only arrests, but a lot of them are convictions * * *.

3. The parade of Wyoming cases which will be discussed one by one provides reason for another strongly disturbing concern. That is the use of the bad acts reputation evidence on rebuttal when the accused has no remaining opportunity to answer.

The strategy once concepted was to hold the bad acts evidence for cross-examination or rebuttal if the defendant testifies. The weight applied is to deter exercise of the right of the defendant to testify which accords with general knowledge that if the defendant does not testify, his chances of acquittal are minimal as a simple fact of how juries decide cases. This case moves the deterrence to an active defense one step back. Even if the accused does not testify, bad acts evidence will be held in readiness to be available for emotional over-spray *if any legitimate defense is made.* The jury can then comfortably decide "if he/she is that kind of a bum, they must have done it."

result-oriented absolution to justify conviction by the extraneous emotionally charged facts of other misdeeds.[4]

Although Justice Holmes had said that the life of the law has not been logic, it has been experience. Here, law is neither. The character of Pena had absolutely· no relevant determinant to tell us whether he was held on the street by Officer Brown or whether it was brother Larry in the coat at that time who then, in escaping from the grasp of the police officer, left the police officer with only the empty coat. My particular disquietude is the course of substitution of justification as a process of jury communication instead of use of realistically probable evidence of guilt or innocence. With due deference to the rationale of the majority, the question whether Pena or brother Larry had prior police problems provided not one whit of factual proof on identity, since obviously both brothers were present at the general scene at that time and the issue was only which had the police officer chased, when and why. I am particularly disturbed because the majority denigrates our historical heritage needlessly, even if we are directed to a result-oriented course of assuring affirmation of conviction. The thesis that if evidence is lacking for proof of guilt, the defendant should be tried on bad acts not only demeans our sacred heritage but also calls for unnecessary subterfuge. If Pena was the attacker from the rear, the jury could likely sift out those reliable facts from the evidence.[5]

**4.** The perspicacity if not the persuasion of Professor Slough and Mr. Knightly in 1956 is ever so much more clearly seen in a reconstructed premise for proof of guilt:

Strongly entrenched among many American traditions is the concept that man should not be judged strenuously by reference to the awesome spectre of his past life. When one faces trial for a specific crime, he should not be held to answer for the scandal that his earlier vices would most certainly produce. Though he has committed many crimes under circumstances which would increase the probability that he has committed the crime charged, it remains an unalterable fact that members of the jury, of nobler root, will lend excessive weight to a record of crime. Evidence of other crimes and misdeeds is not excluded because of an inherent lack of probative value, but is withheld as a precaution against inciting prejudice. Adherents to the common law have for centuries boasted of a certain Anglo–American solicitude for the prisoner, contrasting their accusatorial methods with the inquisitorial devices of continental jurists.

On the basis of what has been said, it would appear that a record of crime would be forever barred from the stream of evidence that washes through the trial of a case; but a thousand precedents born of clashing principles rule otherwise. It is one thing to rule out evidence of crime which reflects only a vague propensity, it is another thing to rule out evidence of other crimes strongly relevant to the facts in issue. It is one thing to rule out evidence of character when the accused has not broached the subject, it is another thing to attack the credibility of the accused once he has elected to take the stand as a witness. Common law precepts, though well-meaning and unctuously spoken, die quickly when trapped in the withering crossfire of judicial exceptions.

Slough and Knightly, *Other Vices, Other Crimes,* 41 Iowa L.Rev. 325, 325 (1956) (footnote omitted).

**5.** It is no different than if we adopt the circumstance of occupation as evidence of guilt, such as would, for example, justify the jury to be advised that the fact of a twenty-year occupational involvement by a practicing lawyer could be considered proof of guilt to a charge of cheating the widow out of her inheritance. If we convict by bad character reputation, the opportunities are limitless. Imagine what could be done with the Housing and Urban Development (HUD) employees, (national) legislators, used car salesmen or high risk investment security peddlers.

I am inclined to agree with the analysis found in a Texas appellate criminal court dissent which involved a choice of guilt between two identified persons:

Once again, this Court has managed to provide bench and bar with an ostensibly authoritative opinion concerning the law of extraneous offenses which effectively eviscerates the erstwhile requirement that such evidence be relevant to a material issue in the case. It astonishes me that so little thought goes into articulating the precise manner in which such evidence bears upon the legitimate issues of a case, and that so much wind passes in the process.

*Beets v. State,* 767 S.W.2d 711, 759 (Tex.Cr.App. 1987).

In current vogue is the alleged quotation from an ex-prosecutor from Texas who is reported to have said publicly that any journeyman prosecutor can convict the guilty, but it takes a really professional prosecutor to convict the innocent. With bad acts and historical reputation as the median of persuasive proof, the capacity for conviction of the innocent is surely not limited only to the extraordinarily gifted professional prosecutor.

I am not enlightened in dedication to historical principles by excusatory reliance on deference to the trial court decision. Either our system is confined and confirmed by rules or it is happenstance and accident in its character of operation denominated by the emotional characteristics and the political persuasion of the decision maker. To understand the relation of discretion to reason is to appreciate the thoughtfulness of this court in adoption of the definition of discretion in *Martin v. State*, 720 P.2d 894, 897 (Wyo.1986) as a responsibility not emboldened by unlimited choice:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.

The history of this century in the endangered status of democratic governments from totalitarianism has demonstrated that unlimited choice acquired by the directed few will ultimately inflict unlimited societal punishment on the majority. If law is the basis of society, then the adaptation of W.R.E. 404(b) as a function of the operation of that law cannot contemplate a total abolition of the 600–year historical basis of our criminal processes founded on proof of guilt for conviction. The prejudicial impact of other crime evidence is an observable function of any jury interaction. *See* Note, *Other Crimes Evidence at Trial: Of Balancing and Other Matters*, 70 Yale L.J. 763 (1961).

A similar factual situation was portrayed in *United States v. Afjehei*, 869 F.2d 670 (2d Cir.1989), where a conviction was reversed for inappropriate admission of other events, W.R.E. 404(b) type evidence. Afjehei was charged with importation of heroin and the disputed evidence related to his earlier travels in and out of this country to the Middle East area as a "travel history." The basis for government contention of admissibility under F.R.E. 404(b) was to attack a status of claimed student status and establish familiarity with international travel.

Afjehei's principal argument on appeal is that, under Rules 403 and 404(b) of the Federal Rules of Evidence, the trial court should have excluded the evidence of his prior trips because its probative value was nonexistent or at least was substantially outweighed by the danger of unfair prejudice resulting from its admission. * * * For the reasons below, we conclude that the prior-trip evidence should have been excluded, and we therefore vacate the judgment of conviction and remand for a new trial.

* * * * * *

Under Rule 404(b), although evidence of other acts "is not admissible to prove the character of a person in order to show [that he acted] in conformity therewith," such evidence "may" be "admissible for other purposes, such as proof of ... knowledge." Fed.R.Evid. 404(b). * * * [E]vidence of another act should not be admitted to show knowledge unless the other act is "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence." *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir.1987). "Similarity, being a matter of relevancy, is judged by the degree in which the prior act approaches near identity with the elements of the offense charged. There is no necessity for synonymity but there must be *substantial* relevancy...." *United States v. Kasouris*, 474 F.2d 689, 692 (5th Cir.1973) (emphasis in original); *but see* 2 Weinstein's *Evidence* ¶ 404[12], at 404–90 to 404–91 (1988) (suggesting that trial court is given especially broad discretion to view acts as similar in narcotics cases). If the other-act evidence does not provide a reasonable basis for inferring knowledge, its offer for that purpose should be rejected on grounds of relevance.

Further, once the trial court has concluded that other-act evidence is sufficiently similar to be relevant, it must still perform the balancing analysis envisioned by Rule 403, which allows the court to exclude even relevant evidence if

its probative value is substantially outweighed by its potential for unfair prejudice. Fed.R.Evid. 403, 404(b) Advisory Committee Note; *see United States v. Peterson,* 808 F.2d at 974. Though a ruling under Rule 403 is reviewed under the abuse-of-discretion standard, *id.,* we have found it such an abuse to admit similar act evidence if the other act or acts are not sufficiently similar to the conduct at issue, or if the chain of inferences necessary to connect the evidence with the ultimate fact to be proved is unduly long.

*Affehei,* 869 F.2d at 672–74 (emphasis in original).

A similarity can also be found in *United States v. Monzon,* 869 F.2d 338, 343 (7th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989) (emphasis in original), where the officer was permitted to testify

> that he twice observed the Defendant— once after his arrest in this case and also eight months prior to the arrest—sporting a long pinky fingernail. Officer Rickey testified that growing a long pinky fingernail was a fad among cocaine users and traffickers. Defendant objected at trial, and in a pre-trial motion *in limine,* to all of this testimony, but those objections were overruled without explanation by the trial court.

That court first established, contrary to the contention of the United States, that the evidence was not transactional nor intrinsic to the occurrence. *Cf. Crozier v. State,* 723 P.2d 42 (Wyo.1986). The federal court observed that neither the marijuana, which was another issue, nor the pinky fingernail testimony were intrinsically related to the facts of the case. Testing the W.R.E. 404(b) admission under the four-point test of the circuit court,[6] the court found that in no way was the contested evidence probative of a special intent factor intrinsic to the offense charged. That court noted that in the absence of a limiting instruction, the jury would probably "use the evidence not as proof of the Defendant's intent, but as pure propensity evidence. Thus, since there was no evidence to show that the marijuana and long pinky fingernail were relevant to the matter in issue, we find that it was error for the court to admit the evidence." *Monzon,* 869 F.2d at 344–45. Introduction was in error, but harmless within the facts of the case. Admission of similarly presented extrinsic occurrence evidence was not harmless in *United States v. DeGeratto,* 876 F.2d 576 (7th Cir.1989). *See likewise Huff v. State,* 544 So.2d 1143 (Fla.App.1989) and *United States v. Garcia–Rosa,* 876 F.2d 209 (1st Cir.1989).

This court in *Crozier* recognized that evidence of other acts or crimes that are intrinsically related to the facts of the case are admissible without reference to W.R.E. 404(b) so long as the probative value of the evidence outweighs its prejudicial effect. The pre-1980 development in Wyoming cases is apposite to the national principles and the rules stated more recently in *Affehei,* 869 F.2d 670 and *Monzon,* 869 F.2d 338. What has since occurred is another story as will be demonstrated by an analysis of this last decade in bad acts evidentiary usage for criminal prosecution.

In *Elliott v. State,* 600 P.2d 1044, 1047 (Wyo.1979), this court stated that "Wyoming unquestionably is committed to the general rule that evidence of other crimes or wrongdoing normally is not admissible in the trial of a criminal case." Cited as authority for this statement are *Newell v. State,* 548 P.2d 8 (Wyo.1976); *Dorador v. State,* 520 P.2d 230 (Wyo.1974); *Gabrielson v. State,* 510 P.2d 534 (Wyo.1973); and *Rosencrance v. State,* 33 Wyo. 360, 239 P.

---

**6.** The four-point test includes:

[1] [T]he evidence must be directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged * * * [;] [2] [T]he evidence must show that the other act is similar enough and close enough in time to be relevant to the matter in issue * * * [;] [3] [T]he evidence must be such that the jury could find "that the act occurred and that the defendant was the actor," * * * *[;] [and 4] [T]he evidence still is* subject to the requirement of Rule 403 that its probative value is not substantially outweighed by the danger of unfair prejudice. *Monzon,* 869 F.2d at 344 (quoting *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988)).

952 (1925). *See also Kwallek v. State,* 596 P.2d 1372 (Wyo.1979), where evidence of prior misdeeds and criminal conduct were improperly admitted in a barroom fist fight, aggravated assault environs. The conviction was not reversed since a bench trial was involved. In *Dorador,* 520 P.2d at 232, we stated:

> [A] party is not to be convicted of one crime by proof that he is guilty of another.

Otherwise stated, the prosecution may not attack the character of a defendant unless the defendant himself has first placed his character in issue. * * * The record in Dorador's trial shows the prosecution placed the accused's character in issue and produced testimony designed to show criminal misconduct which was in no manner connected with the charge for which the defendant was being tried.

The rule was not really applied in *Elliott* where an amendment to the principle was derived to permit other person sexual misconduct, *see* Note, *The Admissibility of Prior Bad Acts in Sexual Assault Cases Under Alaska Rule of Evidence 404(b)— An Emerging Double Standard,* 5 Alaska L.Rev. 193 (1988), as substantive evidence and has certainly been honored by non-observance in the subsequent cases. The frequency of the use of W.R.E. 404(b) evidence and the illogic to find some justification has proceeded a piece in an accelerated crescendo in the Wyoming cases that have followed in the past decade. The roar of the thunder in the storm to add bad acts to the arsenal of artillery in conviction is truly deafening. In the process, essentially nothing remains to the basic tenet of our law that conviction should be proven by evidence intrinsic to the claimed offense.

Unquestionably, the watershed where everything went against the charged defendant as an overriding tenet of Wyoming law came out of the *Hopkinson* litigation. *Hopkinson v. State,* 632 P.2d 79 (Wyo.1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Hopkinson v. Shillinger,* 648 F.Supp. 141 (D.Wyo.1986), *aff'd in part and rev'd in part* 866 F.2d 1185 (10th Cir.1989); *Hopkinson v. Shil-*

*linger,* 645 F.Supp. 374 (D.Wyo.1986). The course of other Wyoming cases is informative but disturbing. *Sanville v. State,* 593 P.2d 1340 (Wyo.1979) was a bad check charge with a prior history of bad checks as a course of conduct showing intent and plan; defined as a sound discretion, clear abuse inquiry on appeal; *affirmed. Goodman v. State,* 601 P.2d 178 (Wyo.1979) was a negligent homicide for killing an unborn child by assault on the mother with evidence of an event ten years before of wounding a girlfriend; admissible on the element of intent as probative evidence; *affirmed. Reinholt v. State,* 601 P.2d 1311, 1312 (Wyo.1979) presented burglary and auto theft. The police officer testified about prior burglaries by the suspect and the evidence was approved on the basis that defendant's counsel "opened the door;" *affirmed.* In *Grabill v. State,* 621 P.2d 802 (Wyo.1980), charged child abuse with evidence of prior abuse incidents with other children introduced during rebuttal as proof of identity as principal evidence of guilt; *affirmed.* In *Connolly v. State,* 610 P.2d 1008 (Wyo.1980), assault and battery with an intent to commit a felony—sexual assault—was charged and evidence of prior attempts to touch the victim was introduced to prove intent, the narrow issue on appeal was failure to give a cautionary instruction which was not requested, no plain error; *affirmed. Stambaugh v. State,* 613 P.2d 1237 (Wyo.1980) presented prosecutorial reference to prior criminal status in rape charge; admission deemed harmless; *affirmed. Hatheway v. State,* 623 P.2d 741 (Wyo.1981) was an embezzlement case with evidence of swindling other people when acting as manager of a trailer court; held admissible as similar acts to show a course of conduct. This court assumed what the defendant may have intended to contend as a defense such as that he had not merely made a mistake in his bookkeeping; *affirmed.*

*Vasquez v. State,* 623 P.2d 1205 (Wyo. 1981) concerned sexual assault supplemented by admission of evidence of involuntary sexual intercourse prior to divorce as evidence of assault on the date when the divorce was granted; *affirmed. Perry v.*

*Vaught,* 624 P.2d 776 (Wyo.1981) was a deed cancellation proceeding with bad acts transitional evidence introduced. Attempts to prevent trial attendance were admissible as a course of conduct; *affirmed. Bradley v. State,* 635 P.2d 1161 (Wyo.1981) charged willful destruction of property with admissibility of assaulting a police officer, which objection was not taken, and determined on the basis of a plain error application with failure to object constituting a waiver; *affirmed.* In *Evans v. State,* 655 P.2d 1214 (Wyo.1982), the defendant was convicted of sexual assault and of being a habitual criminal. Admission of testimony of another witness in a separate rape a year earlier with similarity to make evidence admissible for the purpose of proving motive; *affirmed.* For *Ostrowski v. State,* 665 P.2d 471 (Wyo.1983), as a controlled substance case, prior acts of possession of controlled substances and concealing stolen property were admissible; *affirmed. Ortega v. State,* 669 P.2d 935, 944 (Wyo.1983) was a second-degree murder conviction of his wife; evidence of prior assault to rebut defense of "mistake or accident;" *affirmed.*

In the case of *Bishop v. State,* 687 P.2d 242 (Wyo.1984), *cert. denied* 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985), charged burglary, prior burglaries as uncharged offenses with the connection made that the uncharged offenses, for which there was no identification admissible, were to be found from the fact that the defendant was in Laramie on the date of the occurrence. In an understatement of monumental dimension, this court said:

> Wyoming follows the general rule that evidence of other crimes, wrongs, or acts is normally not admissible in the trial of a criminal case. * * * The general rule is codified in the first sentence of Rule 404(b). In applying the second sentence of the rule, however, we have adopted a rather liberal attitude towards admitting evidence of other crimes, wrongs, or acts.

*Id.* at 245. Justice Cardine stated in dissent:

> Appellant was not charged with nor convicted of the three unsolved burglaries. With respect to the two burglaries of September 30, 1981, all that could be said was that appellant was in the town of Laramie on the date they occurred. So were approximately 20,000 other people in town on this date.

*Id.* at 249; *affirmed.* In *Schmunk v. State,* 714 P.2d 724 (Wyo.1986), a murder case, inadvertent inclusion of a reference to prior bad acts for which a motion in limine had been granted became a factor of cumulative error and reversal; *reversed. Carey v. State,* 715 P.2d 244 (Wyo.), *cert. denied* 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986) was a charged sexual assault case with admission of evidence of a prior sexual assault charge for which the accused was acquitted, arising from two hung juries after which a judgment of acquittal was subsequently granted. Relevance in the acquitted or non-convicted charges was found with respect to motive, knowledge and intent as relating to the question of consent and credibility; *affirmed.*

In *Story v. State,* 721 P.2d 1020 (Wyo. 1986), the physician was charged with rape to a number of patients with rebuttal testimony as an uncharged offense made by another. Defendant failed to show abuse of discretion with rebuttal validity showing a common plan or scheme when material restated to the other charges; *affirmed. Noetzelmann v. State,* 721 P.2d 579 (Wyo. 1986) concerned a controlled substance offense with evidence of prior sale of marijuana to children and an entrapment defense. Prior offense evidence used in response was approved; *affirmed. Crozier,* 723 P.2d 42 was a murder of a child; course of events evidence of marijuana use; complete story or same transaction rule as a course of conduct; *affirmed. Scadden v. State,* 732 P.2d 1036 (Wyo.1987), involved a volleyball coach's sexual assault on his students; general course of events as evidence of his relationship with female students for course of conduct evidence; *affirmed.*

Then in *Brown v. State,* 736 P.2d 1110 (Wyo.1987) (Urbigkit, J., dissenting), the appeal presented an incest charge of a teenager with testimony of the older sister

permitted of similar uncharged prior events. There was in the opinion another monumental understatement by the majority: "We must assume that the jury convicted appellant for the crime charged * * *." *Id.* at 1114; *affirmed. Makinen v. State,* 737 P.2d 345 (Wyo.1987) was another sexual assault on the step-daughter with bad acts evidence of other uncharged offenses of a similar kind with the same victim. I specially concurred on the basis that the evidence involved the same victim and constituted an ongoing circumstance; *affirmed. Ramirez v. State,* 739 P.2d 1214 (Wyo.1987) was attempted second-degree murder with course of events evidence of concurrent sexual assault; *affirmed. Bradley v. State,* 741 P.2d 1061 (Wyo.1987) was a murder charge with exclusion of bad acts conduct of victim held proper; also *affirmed* when denied to defense. *Coleman v. State,* 741 P.2d 99 (Wyo.1987) presented destruction of property involving ex-girlfriend with general evidence of other events of harassment for motive and continuing course of conduct; *affirmed.* In *Marker v. State,* 748 P.2d 295 (Wyo.1988), we had aggravated assault on a child; sexually oriented with evidence introduced of sexually explicit magazine materials relating to offenses against children. Defendant denied offense and blamed mother. The evidence was admissible on the question of who caused the injury as an identity inquiry; *affirmed. Trujillo v. State,* 750 P.2d 1334 (Wyo.1988) presented aggravated assault with evidence of prior fighting the same evening and hostile attitude. The evidence was admissible as intent and state

of mind involving knowledge and recklessness for an individual who was a trained fighter; *affirmed.* In *Cutbirth v. State,* 751 P.2d 1257 (Wyo.1988) (Urbigkit, J., dissenting), homicide was presented as a result of rape. Evidence of a battery by the defendant on his wife on some prior occasion was admitted by the trial court on motive, malice, lack of accident, and course of conduct; *affirmed.* In *Miller v. State,* 755 P.2d 855 (Wyo.1988) (Urbigkit, J., dissenting on other grounds), a course of conduct bad acts was presented in the admission of a forged check, although the checks received and cashed after the homicide were considered harmless although admitted in error; *affirmed. Schwenke v. State,* 768 P.2d 1031 (Wyo.1989) was a sexual abuse case on a child; evidence of prior conduct with the same child; *affirmed. Lauthern v. State,* 769 P.2d 350 (Wyo. 1989) (Urbigkit, J., dissenting) involved convictions of aggravated burglary, aggravated assault and battery, and attempted second-degree murder; evidence of previous instance of problems with the same person. Failure to object raised a plain error view and denied appeal as a course of conduct inquiry; *affirmed.* Finally, *Justice v. State,* 775 P.2d 1002 (Wyo.1989) addressed aggravated robbery with the issue of identity, evidence of theft of property, missing checks with evidence generally admissible on the identity of the perpetrator and also as the history of the events and natural development of the facts; *affirmed.*[7]

The panorama of cases provides an undeniable conclusion—whatever the rationale,

---

7. Thoughtful consideration is afforded by a large variety of law journal reviews. See *Brown,* 736 P.2d at 1123 (Urbigkit, J., dissenting) and Note, *Evidence—The Impotence of Wyoming Rule of Evidence 404 in Sex Crime Trials: Brown v. State,* 736 P.2d 1110 (Wyo.1987), XXIII Land & Water L.Rev. 267 (1988). *See also* Note, *Evidence, Child Abuse—Rule 404(b) of the Wyoming Rules of Evidence: What Protection is Left After Grabill v. State, 621 P.2d 802 (Wyo. 1980)?,* XVI Land and Water L.Rev. 769 (1981). The criticism of either case note has surely not reached the persuasive attention of this court. See current review in Hutton, *Commentary: Prior Bad Acts Evidence in Cases of Sexual Contact With a Child,* 34 S.D.L.Rev. 604 (1989) and Note, *Expert Testimony in Child Sexual Abuse Prosecu-* *tions: A Spectrum of Uses,* 68 B.U.L.Rev. 155 (1988). Of special authenticity, see Imwinkelried, *The Need to Amend Federal Rule of Evidence 404(b): The Threat to the Future of the Federal Rules of Evidence,* 30 Vill.L.Rev. 1465 (1985); Note, *Developments in Evidence of Other Crimes,* 7 U.Mich.J.L.Ref. 535 (1974); and Note, *supra* 70 Yale L.J. 763. *See also* Lacy, *Admissibility of Evidence of Crimes Not Charged in the Indictment,* 31 Or.L.Rev. 267 (1952) and Uviller, *Evidence of Character to Prove Conduct: Illusion, Illogic, and Injustice in the Courtroom,* 130 U.Pa.L.Rev. 845 (1982). *Cf.* Annotation, *Admissibility of Evidence of Pertinent Trait Under Rule 404(a) of the Uniform Rules of Evidence,* 56 A.L.R. 4th 402 (1987).

justification or explanation—every use of bad acts and reputation evidence has been acceptable when questioned on appeal during this entire decade except for the one case, *Schmunk*, 714 P.2d 724. No limits to acceptability are enforced which have become a fact obviously understood by prosecutor and trial bench.

Within this observable direction away from conviction by evidence of guilt of the charged offense to a general use of character evidence as an effective substitute for proof, we now arrive at the case of evidentiary dispute in this appeal. The jury was called to determine which brother it was on the ground in the grasp of the police officer and which may have struck the police officer from the back. The singular evidence used for conviction not only of which was which, but to augment the offense into a more serious posture was a prior history of police related problems of the one brother, Pena, evidenced by a parade of seven

police officers describing five other events, sufficiently persuading the jury that at least this Pena brother was of bad character and deserved a felony conviction for resisting the questionable detention for whatever purpose it had occurred.[8] It is my persuasion from the present status of developments that this majority should either announce that conviction by proof of guilt is abrogated with our historical legal heritage repealed and authenticate conviction by bad character or step back and apply relevance and persuasive reason to that heritage and the appended exception authenticated by W.R.E. 404(b) incursion. *See* Imwinkelried, *The Need to Amend Federal Rule of Evidence 404(b): The Threat to The Future of the Federal Rules of Evidence*, 30 Vill.L.Rev. 1465 (1985).[9]

The course of dissents within the cited cases has surely provided an adequate warning. Justice Rose stated in dissent in *Goodman*, 601 P.2d at 189:

8. The trial court stated:

It's the court's view that the real dispute here is that the defendants either incited or took an active roll [sic] in assaulting the officer, or that they didn't. The testimony is that they simply laid back passively, and that the police were aggressors in this kind of a situation.

Therefore, based on that, the real dispute, I think, in this case is whether or not the—the real dispute is: Who are the aggressor, the police or the Penas?

9. The near ultimate in infusion of other occurrence bad acts in a criminal trial is vividly portrayed in *Gibbs v. State*, 538 N.E.2d 937, 938–41 (Ind.1989), where the court said in reversing the otherwise unsubstantiated fourteen of nineteen conviction counts of burglary:

Appellant Thomas Gibbs stood trial for nineteen burglaries. The deputy prosecutor filed five witness lists with 116 names; the longest witness list had no addresses. He resisted giving further information. He provided addresses only on the morning of trial. Even then he refused to inform the defense which witnesses had information about which offense. It turned out that most of the witnesses had no information about the crimes being tried. The deputy prosecutor called them anyway—66 of them testified over a period of fifteen days, producing more than 3,000 pages of transcript. Sixty-five of the 66 could not identify the defendant.

\* \* \* \* \* \*

Gibbs argues that the 39 uncharged burglaries should not have been admitted into evidence. He maintains the State never connect-

ed the uncharged crimes to him. The uncharged crimes, he claims, raised the possibility that the jury convicted him solely because of his bad character. The State responds that the evidence was admissible to prove identity, motive, and intent. The only issue at trial, however, was identity.

\* \* \* \* \* \*

After the deputy prosecutor presented evidence on the nineteen charged burglaries, he sought to admit 39 extrinsic burglaries. The testimony on the extrinsic burglaries was more lengthy than the testimony on the charged burglaries. \* \* \*

\* \* \* \* \* \*

Had the prosecutor wanted to admit evidence on these numerous extrinsic burglaries, he need only have charged Gibbs with the crimes.

The Indiana Supreme Court affirmed as to four charges substantiated by proven evidence and reversed the other fifteen. The error in admission was harmless for the four convictions where substantiating evidence was strong. Compare the strongly corroborative factors of modus operandi and identity from other rapes held to be properly admissible in the rape/murder case of *People v. Phillips*, 127 Ill.2d 499, 131 Ill.Dec. 125, 538 N.E.2d 500 (1989). *See likewise People v. Annerino*, 182 Ill.App.3d 920, 131 Ill. Dec. 395, 538 N.E.2d 770 (1989), when the second uncharged offense of threatening the witness occurred in open court during the trial of the first offense.

The danger of prejudice was that the jury would punish the appellant for the prior shooting even if it had doubts about the guilt of the appellant with respect to the crime for which he was standing trial. Since I am unconvinced that the prior shooting had any probative value, I think it was patently improper to admit the evidence and thereby submit the defendant to the above-discussed danger of prejudice. While it may be argued that the danger of prejudice may have been speculative, this danger, in my judgment, outweighed the nonexistent probative value of the prior shooting.

Restated by reputation from *Kwallek*, 596 P.2d 1372 in *Grabill*, 621 at 815–16, we said:

"... The effect of admitting this evidence for the purpose offered (attacking credibility) or any purpose conceived of by *Lindsay* [*State v. Lindsay*, 77 Wyo. 410, 317 P.2d 506 (1957)], supra, would be to invite the very dangers that we have warned about in *Dorador v. State*, Wyo., 520 P.2d 230 (1974), *Gabrielson v. State*, Wyo. 510 P.2d 534 ([Wyo.] 1973), *Rosencrance v. State*, 33 Wyo. 360, 239 P. 952 (1925), and *Newell v. State*, Wyo., 548 P.2d 8 (1976)—namely, it requires the defendant to meet and explain other acts than those with which he is charged. Furthermore, the admission of this testimony has a tendency to lead the jury to believe that it is permissible to convict for conduct other than that with which the defendant is charged."

And further reminded in *Carey*, 715 P.2d at 250–52 (quoting *Gabrielson*, 510 P.2d at 536):

"[I]t is settled law in this jurisdiction that mere charges, accusation, and arrests are consistent with innocence; and they should not be inquired into if the purpose of the prosecution is to discredit the witness in the eyes of the jury and convey to the jury knowledge that such witness was charged with a crime."

\* \* \* \* \* \*

The majority do not analyze separately the admission of the evidence of the mugging attack in Gillette. I can conceive of no purpose for the allowance of this evidence other than to establish that appellant generally was a bad person and to raise the inference that he committed the charged offense. The Wyoming Rules of Evidence expressly prohibit the admission of evidence of a defendant's prior wrongdoings for such purpose. Rule 404(b), W.R.E., provides:

"*Other crimes, wrongs, or acts.—* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. \* \* \* \*"

This rule—a corollary of the presumption of innocence—requires that a defendant be tried for what he did, not who he is. *United States v. Myers*, 550 F.2d 1036, 1044, 42 A.L.R.Fed. 855 (5th Cir. 1977), cert. denied 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978).

*Carey* is similar, since in present pursuit, there is no evidence of prior bad act criminal conviction included in the testimony of the seven participants in the five events during the seven-year period. Clearly, nothing within those events involved any conviction of a felony. Since the pretrial sentence report is not in the record, nothing really reflects what happened to Pena on those occurrences about which he had no opportunity to answer or respond at his felony trial.

Justice Cardine also addressed in dissent the misdirection of Wyoming evidentiary application of W.R.E. 404(b) at length in *Bishop*, 687 P.2d at 249:

Two concerns are expressed by the first sentence of Rule 404(b) in that (1) the jury may convict a "bad man" who deserves to be punished, not because of the crime charged, but because of prior or subsequent misdeeds, and (2) that the jury might infer that because the accused has committed other crimes, he probably also committed this crime. \* \* \*

A defendant must be tried for what he did and not for who he is. *United States v. Foskey*, 636 F.2d 517 (D.C.Cir.1980).

"Rules 403 and 404(b) are not obstacles to be cleared at all costs, even by cutting around corners whenever it is possible to do so. These rules were designed to ensure a defendant a fair and just trial based upon the evidence presented, not upon impermissible inferences of criminal predisposition or by confusion of the issues." Id. at 525.

For other-acts evidence to be admissible, it must be relevant to an actual issue of the case tried. The probative value must not be outweighed by unfair prejudice. There is no presumption that other-crime evidence is relevant. *United States v. DeVaughn*, 601 F.2d 42 (2nd Cir.1979). See, *United States v. Halper*, 590 F.2d 422 (2nd Cir.1978). There must be a logical nexus between the crimes. *United States v. Mann*, 590 F.2d 361 (1st Cir.1978). The evidence must be offered for an issue that is in question. *United States v. Ring*, 513 F.2d 1001 (6th Cir. 1975), 30 A.L.R.Fed. 860.

And quoting from *United States v. Burkhart*, 458 F.2d 201, 204–05 (10th Cir.1972) (footnote omitted), Justice Cardine said:

"Too often we lose sight of the fact that the rule is primarily a rule of exclusion of evidence and not one of admission, and, although there are many exceptions, these do not detract from the general exclusionary approach which the rule demands.

"Several facts have contributed to formulation of a cautious judicial attitude. "First, the accused is required to defend charges which are not described in the information or indictment. As a result he is required to defend past actions [for] which he may have in the past answered and with respect to which he may have even served his sentence. Thus, he is in effect tried as a recidivist though such a charge is not a part of the federal criminal code.

"Secondly, although such evidence may have at least some relevance to the offense being tried, its predominant quality is to show up the defendant's character as a car thief or a bad check artist, for example. Proof of defendant's socio-pathic disposition is not a valid object. Showing that a man is generally bad has never been under our system allowable. The defendant has a right to be tried on the truth of the specific charge contained in the indictment.

"Third, an obvious truth is that once prior convictions are introduced the trial is, for all practical purposes, completed and the guilty outcome follows as a mere formality. This is true regardless of the care and caution employed by the court in instructing the jury.

"Thus, it is clear that the problem is not a simple evidentiary one, but rather goes to the fundamental fairness and justice of the trial itself."

*Bishop*, 687 P.2d at 249–50. In *Brown*, 736 P.2d at 1117–20, I agreed in dissent:

In conclusion * * *, justifying "bad acts" testimony to prove guilt, the court moves further in the direction of empirical substitution of adverse character for substantive fact evidence as the basis for conviction, a result with which I strongly disagree and from which I dissent.

* * * * * *

* * * The initial perspective was that the defendant should be convicted on present evidence of the offense and not unfavorable character, bad reputation, or history. * * *

This court now completes that transfer by defining disposition as a motive and by exception, then essentially destroys the century-long cardinal principle of English law that the conviction should be determined by guilt, and not by reputation or prior bad history. The observable corollary is that those unlucky enough to once be caught are eternally damned in contradistinction to the lucky who initially escaped appropriate responsibility.

*See also Makinen*, 737 P.2d at 350 which, in special concurrence, stated:

Evidence about other bad acts which attacks the character of the accused should be confined and carefully circumscribed in the interest of fairness and due process, unless it involves the course of the transaction or context of the

event. *United States v. Azure*, 801 F.2d 336 (8th Cir.1986); *Lessard v. State*, Wyo., 719 P.2d 227 (1986).

The probity in proof worthiness in these prior police problems cannot be logically compared to a course of events in a long-term sexual relationship. *See State v. Shamsid–Deen*, 324 N.C. 437, 379 S.E.2d 842 (1989), as a life sentence incest case. That probative worth in genuineness of the issue addressed should not be ignored in affirmation of any application of relevant bad acts evidence is lucidly addressed in *State v. Stevens*, 115 N.J. 289, 558 A.2d 833 (1989). Three non-indicted instances of misconduct were introduced in support of two other sexual assault charges for which the defendant police officer was convicted. The court first recognized the comparable rule to W.R.E. 404(a) and (b) denying general inadmissibility with the exception of W.R.E. 404(b). The rule perpetuated New Jersey's long-standing common law rule that excluded other crime evidence when offered solely to prove a defendant's propensity to commit a crime. The court then recognized:

> The common-law rule has been described as a compromise between two extreme possibilities: on the one hand that other acts, because they cast light on propensities and thence on the issues, may always be fully explored; on the other hand that other acts must be absolutely excluded because of the prejudice, confusion, and surprise their use would create. The common law accepted neither extreme. It rejected the former; it only adopted the latter subject to the all-important reservation that if other acts were relevant to guilt of the crime charged otherwise than merely through propensity, then those acts might like any other relevant facts be explored.

*Stevens*, 558 A.2d at 838–39. And pursuant to the New Jersey rule, "other-crime evidence is admissible to prove other facts in issue." *Id.* at 839.

A necessary corollary to the principle that other-crime evidence can be admitted to prove any fact in issue—whether or not included among the specific examples set forth in *Rule* 55—is the requirement that the "issue" be genuine, and that the other-crime evidence be necessary for its proof. As one commentator explains:

> " 'Probative worth,' however, consists of more than logical relevance or persuasiveness. No matter how persuasive of the fact it is supposed to prove, other crimes evidence has no probative worth if the fact is not in issue. Perhaps the clearest case would be other crimes evidence offered to prove a fact not material to proof of the charged crime—for example, specific intent in a manslaughter trial. Because such evidence does not advance the search for truth, it serves no purpose which might justify whatever prejudice it creates, and is excluded for that reason. A similar situation would exist when the accused concedes the issue to be proved—for example, when he admits committing the act in question and bases his defense on some other grounds. Courts have applied this principle to forbid the introduction of evidence on issues which seem impossible to dispute, and which are in fact not contested." [Note, *Other Crimes Evidence at Trial: Of Balancing and Other Matters*, 70 Yale L.J. 763, 770–71 (1961).]

\*    \*    \*    \*    \*    \*

There is widespread agreement that other-crime evidence has a unique tendency to turn a jury against the defendant.

> "The likelihood of prejudice is acute when the proffered evidence is proof of a defendant's uncharged misconduct. As part of the Chicago Jury Project, researchers attempted to determine the impact of a defendant's prior criminal record on the probability of conviction. The researchers found that conviction rates were significantly greater after a jury learned that the defendant had a criminal record or had been charged with even a minor crime. The researchers concluded that juries aware of prior misconduct employ an entirely 'different \* \* \* calculus of

probabilities' to determine the defendant's guilt or innocence."

*Stevens*, 558 A.2d at 839–41 (quoting Imwinkelried, *supra*, 30 Vill.L.Rev. at 1487–89). Consequently, the New Jersey Supreme Court set three criteria by first exacting probative worth, next recognizing a balancing requirement under a rule comparable to our W.R.E. 403 approach, and finally that an appropriate limiting instruction should be given.

In weighing the probative worth of other-crime evidence, a court should consider not only its relevance but whether its proffered use in the case can adequately be served by other evidence.

"The trial judge should be careful to exclude other torts or crimes evidence, even though it is independently relevant, wherever he can reasonably do so without damaging the plaintiff's or prosecutor's case. For example, if the prosecutor has adequate proof of identity, or of motive and the like, he should not be permitted to use the highly inflammatory evidence of other crimes to establish those facts. In a forgery case where authorship of the allegedly forged writing is in issue, the trial judge, for instance, should not admit standards indicating the defendant's guilt of other forgeries if neutral standards of the defendant's handwriting are available to the prosecutor." [1963 Report at 103.]

*Stevens*, 558 A.2d at 841. The court also required that the limiting instruction addressing the use of other crime evidence be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence with sufficient reference to the factual context of the case to enable a jury to comprehend and appreciate the fine distinction to which it is required to adhere.[10]

It is my conclusion that the bad acts evidence used to convict Pena failed both *Stevens'* tests of probative worth and balanced prejudice to an extent that the limiting instruction as given, however sincerely presented by the trial court, could not possibly escape conviction by the power of adverse character evidence. Pena, guilty as he may have been for improvidently engaging in the early morning fracas on that wintery street in front of his house, was not given a fair trial or convicted alone upon relevant evidence of what he did or did not do in violation of any criminal statute. He was convicted for what he had done at other times for which he had likely been given other punishment.[11] Unfortunately, we cannot weigh probative value against prejudicial effect in this occurrence since, as a matter of logic as founded upon cause and effect, the accused's past history provides no weight in present proof of a contested fact. A careful reading of the entire record decisively portrays on a scale of one to ten of relevance as proof that this evidence reaches not even to a one. Whether a choirboy or an arch criminal, Pena either was the individual on the ground or was the "someone else" who came up from behind. As a recent federal court addressed the subject, "[t]he standard for evaluating 404(b) evidence is par-

---

10. Another loadstar is to be observed from this extended quotation from this current New Jersey case about Officer Stevens and his extended course of official misconduct is that bad acts evidence or earlier life mistakes can, like the rain, fall everywhere, and if usable for Pena, can come to call with any other prosecution, including those of a lawyer, doctor, merchant or thief.

11. It is interesting to recall the singularly academic comments of Chief Justice Cardozo in *People v. Zackowitz*, 254 N.Y. 192, 172 N.E. 466, 468 (1930) (quoting Wigmore Evidence, vol. 1, § 194), where he addressed a defendant not unlike the appellant present before the bar of justice here:

There may be cogency in the argument that a quarrelsome defendant is more likely to start a quarrel than one of milder type, a man of dangerous mode of life more likely than a shy recluse. The law is not blind to this, but equally it is not blind to the peril to the innocent if character is accepted as probative of crime. "The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly in the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge."

ticularly stringent when it is offered to show identity. * * * '[T]he physical similarity must be such that it marks the offenses as the handiwork of the accused. In other words, the evidence must demonstrate a modus operandi.' " *United States v. Stubbins,* 877 F.2d 42, 44 (11th Cir.1989) (quoting *United States v. Beechum,* 582 F.2d 898, 912 n. 15 (5th Cir.1978) (en banc), *cert. denied* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979)).

Although Note, *Evidence—The Impotence of Wyoming Rule of Evidence 404 in Sex Crime Trials: Brown v. State,* 736 P.2d 1110 (Wyo.1987), XXIII Land & Water L.Rev. 267, 280 (1988) related to a child sexual abuse case, it would be realistic to finitely modify that language and conclusion.

In *Brown v. State* [and now *Pena v. State*], the court set a troubling precedent. When the court's reasoning is followed by the district courts, other crimes evidence will be virtually admissible per se, in * * * [all criminal] trials. There is a danger that these trials will deny the accused the fundamental fairness that forms the basis of our judicial system. The reasoning set forth in *Brown* [and *Pena*] should therefore be re-examined by the court. A greater awareness of the need to insulate the trier of fact from propensity evidence is required. In this way the rights of those accused of * * * [all] crimes will receive much needed support.

In the earlier article, Note, *Evidence, Child Abuse—Rule 404(b) of the Wyoming Rules of Evidence: What Protection is Left After Grabill v. State, 621 P.2d 802 (Wyo.1980)?,* XVI Land & Water L.Rev. 769 (1981), that author accurately perceived what since has not been either understood or followed by this court.

To properly apply Rule 404(b), the court should require that the evidence of previous bad acts clearly shows the existence of a disputed issue or, that the evidence should show a sufficiently specific motive from which a disputed issue can be inferred when coupled with the other facts of the case. In order to establish intent, motive, plan, signature,

or modus operandi, the evidence of previous acts must bear a substantial similarity to that of the charged offense. Finally, the court should remember that as the need for the evidence of unrelated acts increases, the danger of unfair prejudice rises proportionately. Under these circumstances, it is not proper for the court to allow evidence of the accused's propensity to commit the criminal act even if it is the only evidence available. Nor is it appropriate when applying Rule 403 for the court to give greater weight to the probative value of evidence of prior bad acts simply because there is an absence of evidence to prove the case. *Id.* at 785.

My anguish is in recognition that the more we write on the subject of W.R.E. 404(b), the further the trial courts and this tribunal move away from reality and principle. The ultimate achievement if the movement continues is the application of a principle that it is to be presumed that you were guilty since you had been arrested.

Regretfully, I am again called to dissent.