**Rosemary Wayne PERRY, Appellant (Defendant),**

v.

**William T. VAUGHT, Appellee (Plaintiff).**

**No. 5389.**

Supreme Court of Wyoming.

March 3, 1981.

Jerry A. Yaap, Casper, signed the brief and appeared in oral argument on behalf of appellee.

Before ROSE, C. J.*, and McCLINTOCK, RAPER **, THOMAS and ROONEY, JJ.

RAPER, Justice.

This appeal arises from a judgment and decree canceling the deed to appellant-defendant, Ms. Perry, to a farm located outside of Casper and presents two issues for resolution. First, Ms. Perry claims that there was insufficient evidence to support the district court's findings that the sale was the product of "fraud, undue influence, duress, abuse of confidence, misrepresentations and other unconscionable conduct and questionable means * * *." Second, the suggestion is made that the court erred in admitting evidence of an attempt by Ms. Perry to arrange the absence of the appellee-plaintiff, Mr. Vaught, from the trial.

We find no merit in either argument and we will affirm.

Mr. Vaught is a 76-year-old retired railroad worker who possesses a sixth grade education. He bought a 127-acre farm in 1941 which has been his residence since. Mr. Vaught has no children of his own; his closest relatives are three sisters and a stepson.

In 1970, Mr. Vaught had a heart attack and as a result has been forced to take nitroglycerin daily. Besides his heart condition, Mr. Vaught before 1978 had also been diagnosed as having high blood pressure, hardening of the arteries, and arthritis. Various medications had also been prescribed for these conditions. A medical expert testified that due to Mr. Vaught's condition, one might expect him to have had an occasional loss of memory. An additional problem was the development of cataracts in about 1976. Mr. Vaught has since had two lens transplants to alleviate this condition; however, the testimony was unclear as to how successful the operations were.

Ronald A. Kastanek, Casper, signed the brief and appeared in oral argument on behalf of appellant.

* Chief Justice since January 5, 1981.

** Chief Justice at time of oral argument.

The first meeting between Mr. Vaught and Ms. Perry occurred in 1972 (the testimony conflicts as to whether this was before or after the death of Mr. Vaught's wife). The encounter resulted when Ms. Perry, while working for the humane society, received a report that one of the horses appellee kept on his farm had a cancerous eye. Upon investigation, she discovered the report was true. At her suggestion, Mr. Vaught destroyed the horse. After the initial meeting, Ms. Perry continued to visit Mr. Vaught on a regular basis. During the ensuing four years, her involvement with him grew substantially.

In 1976 Mr. Vaught's cataracts began to drastically reduce his ability to fend for himself. As a result, Ms. Perry began providing transportation and other sundry services. These included grocery shopping and bill paying. Ms. Perry would also, when Mr. Vaught needed to write a check, prepare it for his signature. As one witness testified, "She [Ms. Perry] had control of his money, control of him, had control of everything."

Marjorie Lawson, a former friend of Ms. Perry, testified that during 1975 she and Ms. Perry attempted to purchase an acre of land from Mr. Vaught for the humane society. As a result, Ms. Lawson became acquainted with Mr. Vaught. She testified that at the time he seemed to be "quite spry" and "fairly mentally alert." He, in fact, enjoyed outfoxing Ms. Perry by selling her one-third of an acre for $2,000 when she intended to buy a whole acre for the same price. Ms. Lawson further related that in 1975 both she and Ms. Perry realized how valuable the land was, and how much more valuable it would become. In fact, on one occasion, they were riding in a pickup together when Ms. Perry said she wanted the Vaught land and would do anything to get it, but then tacked on, "well, almost anything." Shortly thereafter, Mr. Vaught showed Ms. Lawson a document he said Ms. Perry was trying to get him to sign. This document, admitted into evidence, would have made Ms. Perry a joint tenant with the right of survivorship. Mr. Vaught indicated to Ms. Lawson that he was not going to sign it.

Toward the end of 1976, Mr. Vaught told the only sister he had who lived in Casper that he had found this young girl to take care of him and that he did not want her—his sister—to bother any more. In November of that year, this sister left Casper and moved to California.

By the middle of 1977, Mr. Vaught's eye condition had deteriorated to the point that it was recommended to him to have surgery. Pursuant to this suggestion, he began consulting a specialist in Boulder, Colorado. This doctor performed an operation to remove the cataract and implant a new lens in the left eye on November 1, 1977. Surgery on the right eye occurred on April 11, 1978.

It was during this time period that Mr. Vaught visited his lawyer and expressed fears that he had conveyed his land to Ms. Perry. His lawyer investigated and found that no deed transferring the property had been recorded. He then suggested to Mr. Vaught that he consider placing his stepson's name on the deed. Mr. Vaught agreed and thus a deed was drafted conveying the property to himself and his stepson as joint tenants with the right of survivorship. This instrument was dated December 31, 1977.

Mr. Vaught returned to his attorney's office within a couple of months when the State Highway Department approached him about buying some of his property for road construction. An agreement was reached to sell three acres of land for $20,100; however, because his stepson was now a record owner, his consent to the deal was also necessary. This resulted in his stepson finding out for the first time he was a joint tenant in the property. A deed conveying the parcel of land to the State was recorded in April of 1978.

Within a month of that transaction, Ms. Perry appeared with Mr. Vaught before the attorney announcing she wanted to buy an acre or two of Mr. Vaught's farm. When informed it was no longer in Mr. Vaught's name alone, Ms. Perry stated that "he nev-

er intended to do anything like that." A couple of weeks later Ms. Perry returned to the attorney's office with Mr. Vaught and announced that he wanted a deed back from his stepson. The attorney asked Mr. Vaught if that was true. According to the attorney's testimony, "he [Mr. Vaught] didn't make any direct reply, he just kind of nodded his head and grunted." The stepson agreed to quitclaim his interest in the land for $8,000. After the deal was completed, Ms. Perry returned with Mr. Vaught to the attorney's office and demanded not only that the attorney no longer represent him, but also that he turn over all of the files.

During the fall of 1978 Ms. Perry began talking of buying some property. She checked with a notary to find out how a quitclaim deed was drafted. She then hired a secretary to type one up. Various people overheard her discussing the possibility of buying two to five acres of land from Mr. Vaught. A handwritten document dated September 15, 1978, signed by both Mr. Vaught and Ms. Perry but not witnessed, was also admitted into evidence. This document was purported by Ms. Perry to be a contract providing for the sale of the entirety of Mr. Vaught's farm to her for approximately $10,000 down. It also indicated that Mr. Vaught had an option of monthly or yearly payments for the rest of his life of an unspecified amount, as well as the expectation that Ms. Perry would "make all improvements on the farm, care for Mr. Vaught for as long as he shall live and care for his two American saddle mares for as long as they shall live." Also, Ms. Perry agreed not to sell the farm to land developers.[1] On October 3, 1978, Mr. Vaught executed a quitclaim deed for the farm to Ms. Perry. The notary did not realize that the deed was for the whole farm. However, Mr. Vaught did tell him that he understood what he was signing.

There was testimony that Ms. Perry has paid to date $18,000 for the property. However, the evidence clearly established that the property was worth over $1,250,000 in 1978.

Sometime in January of 1979, Mr. Vaught returned to his attorney's office with Mr. Boner, a representative of the school district, who was interested in acquiring a 40-acre parcel for the construction of a school. It seemed that Mr. Boner had discovered the quitclaim deed when searching the record and was concerned as to whom the property belonged. Mr. Vaught was stunned to learn that he had conveyed the property away. Shortly thereafter, Mr. Vaught's attorney commenced this action to regain his land. Undaunted, Ms. Perry continued her daily trips to the farm.

In March of 1979, Mr. Richard Gose visited the farm in order to inquire about purchasing a plot of land upon which to build his home. He related the following concerning that conversation:

"* * * There was discussion and not particularly material, other than being small conversation, but when I did, got to that point of telling him my mission there, why I was there, which was fairly early in the conversation, why Mr. Vaught indicated to me that he had some kind of trouble with regard to what I was asking him to purchase the property, he was in trouble with the property, he was in trouble with it. And when I made inquiry as to what his trouble was, he, I believe, he started to answer, he started to say something and a Miss or Mrs. Perry, Rosemary Perry was there, she interrupted me, and by talking about the number of cattle

---

1. The exact text of the handwritten document is as follows:

"I, Rosemary Perry, do agree to pay William T. Vaught approximately $10,000 as a down payment on the farm at 205 Wolf Creek Road, Casper.

"In return Mr. Vaught has the option of monthly or yearly payments for the rest of his life. The property would be paid in full at his death.

"I agree that the farm is to be used as headquarters of Pets Geriatrics and not sold to land developers.

"In addition I will make all improvements on the farm, care for Mr. Vaught for as long as he shall live and care for his two American saddle mares for as long as they shall live.
"/s/ Rosemary Perry
"/s/ W. T. Vaught"

that could be seen along the other side of a little draw out there, and she expressed to him that there were so many.

\* \* \* \* \* \*

" \* \* \* I don't know whether you could see them all, but they were there, that is sort of a ranch quarter out there, and interlaced with that conversation was the fact that Mrs. Perry had purchased about a little over or a little under two acres and was going to put on this purchase of dog kennals [sic], it was pie shaped so she could get a large number of kennals [sic] for dogs who had to go to old folks' homes and didn't have any place to put them, but interlaced with that was the question or statement to Mr. Vaught, which was out of context, that there were so many cattle out there, and Mr. Vaught indicated that there were not that number but another number, and so there was sort of a small argument between the two as to how many cattle there were, and then at a time when this little argument had gone on and was collateral to anything that was said, just unrelated to it actually, Mrs. Perry asked Mr. Vaught to go count them. So he went, at that time and left physically our presence and walked down and around and counted them, and while he was gone Mrs. Perry informed me that she owned all of the property, not, just you know, the whole tract that I was after, that I was there to propose an offer or if I could understand it enough to do so, and that it was not for sale. And so Mr. Vaught counted the cattle, came back and said, no, I was right all there [sic] time there was this many cattle. And she agreed with him.

"It was a child-like parental exchange, she controlled him, displacing him from our presence, and so in the continuing conversation that went on the matter of the number of kennals [sic], the construction of the kennals [sic] and placement confined back to about two acres went on by Mr. [sic] Perry and Mr. Vaught did generally not participate in this conversation, but she was relating to me that at one point she was building these, and that there was a woman, elderly lady, that had characterized as having 2.3 acres of land, this woman with this much land has a dog that is going to be put to sleep because nobody will take care of it, and this woman was going to an old folks home or live with a relative, but she was going to take this dog and put it into a kennal [sic], which wasn't really no interest to me, still small conversation, and I was there for a particular purpose and I intended to pursue, if I could, and so I did say to Mrs. Perry again that I wanted to make an offer to purchase the property, I didn't understand exactly what the geography of the property was, this draw took pretty much of it, but I understood the acreage from this plat that I had purchased from one of the local map sales organizations in Casper, and as I approached this program again of trying to talk to Mr. Vaught about the subject I was there about and getting to the point of does she own the land, asking does she own the land and can I amke [sic] an offer, I am here to make an offer and want to talk to you about it because I talked to him on the phone 2 or 3 or 4 times during the winter to wait so long as it is not so cold, and it wasn't too cold, I pursued this, I got a little persistent to try to convey to Mr. Vaught I was there to try to make an offer to purchase that piece of property, and the property, as I remember it was nominally on the order of a hundred and maybe 20 acres less or 20 acres more, something like that, but the plat that I had showed it to be sizeable [sic] plot, and as I pursued this matter and tried to talk to Mr. Vaught again about it, Mrs. Perry at the same time got into the same kind of little argument. I don't know whether cattle, number of cattle or something else, it was the same relationship of dominant and very subservient or parent and very small child relation, that she had control of whatever Mr. Perry [Mr. Vaught] was going to do, and sent him on this other errand, other argument, to resolve another argument of fact, and he went out and counted whatever he was supposed to count then and

came back. So, as I tried to in this conversation talk to Mr. Perry, I wasn't able to—

"Q. You mean Mr. Vaught.

"A. I mean Mr. Vaught. I never could do so, whenever I would come to grips with him and try to talk to him she directed him as though a small child to absent himself, and then told me she owned it all in his absence, never in his presence, never did she say it in his presence, and it wasn't for sale period."

Meanwhile according to the testimony of Ms. Lawson, Mr. Vaught's living conditions had deteriorated quite rapidly. They had gone from untidy in 1975 to deplorable in 1979. Canned food had exploded and been left in place with the food dripping onto the floor. Weevils were seen in dried food that was scattered around the house. Mr. Vaught's clothes were moth infested. Mice were nesting in the living room. Adding to the mess, Ms. Perry had moved several dogs in with Mr. Vaught. They were not house-trained nor ever taken outside. From the photographs of Mr. Vaught's residence which were admitted into evidence, it is apparent that Ms. Perry had merely placed newspapers over the entire floor for the dogs' use, and then obviously never changed them. Compared to those pictures, the following testimony of Ms. Lawson makes the house sound tidy:

" * * * and Rosemary had brought out, I believe, four chihuihui [sic] type dogs, maybe in '76, let's say, and they were not house-trained.

"Q. Are those the ones that are still residing in the house?

"A. I don't know, I haven't been there for a year, and then by '77 she had brought out 7, now these were all in the house and none of them were house-trained, it was so harsh that I would not even step into the living room area, and I kept telling Mr. Vaught, I said, you must do something, I said, you must tear up this carpet and put down linoleum. These animals aren't house trained, you are going to get sick. His bathroom plumbing wasn't working, ther [sic] was a spider web in the tub, the faucet was frozen up, he couldn't take a bath, the toilet didn't work, the sink did work, it was indescribable, walls that had never been washed, cupboards never straightened, I mean things just heaped, and it was a definite hazard, fire hazard, Rosemary had brought out a little, well, wasn't a little candle affair, it was a tall wooden affair that revolved with heat, put a candle in and had little carved animals, at least Mr. Vaught said Rosemary brought it. I said, please, don't ever light those candles, the place is a fire trap, every exit is blocked except the front door, the big front door was blocked, one door wasn't, every single window was blocked with debris.

\* \* \* \* \* \*

"A. He had the first cataract operation about November 1st, '77.

"Q. Were you in the home following that?

"A. I was only there because Rosemary helped me with garage sale work for the Humane Society and called me to come out and said I cannot put the drops in anybody's eyes, I just can't do it, and I said, well, then, I said, don't call some of the other Humane Society workers, they would faint if they saw that house, I said, because you helped me I will do it. So I would go out, I can't remember, three times a day for a while, and put the drops in Mr. Vaught's eyes. Well, the bedding was so filthy I said you are going to get an eye infection, Bill, and I am going to take this bedding home, and I am going to wash it, and I took some towels home. Now, this didn't make my husband very happy, he said, what are you doing bringing anything that filthy into our house? I said, well, I don't want him to get an eye infection.

"Q. Was this during the period of time Mrs. Perry was caring for him?

"A. She was supposed to be caring for him at that time, yes, but the dust was just heaped beside the desk, his gauze pads and everything he was supposed to use for his eye were just set down in dust, I mean, it was unbelievable.

"Q. Were you at his home following the second surgery?

"A. No.

"Q. All right. And did you have any conversations with Mrs. Perry following this eye surgery?

"A. Yes, following the first eye surgery, she was outside working or close by the house, and I went out and said, Rosemary, this place is filthy, and it makes me angry, and I said it is not sanitary, and she said I am not going to clean it up.

"Q. Did you observe her cleaning?

"A. Never.

 * * * * * *

" * * * I decided to go out, and it was on the 23rd [of June, 1979], I am sure, to see what was happening with Mr. Vaught, and those animals out there.

"Q. All right. Will you tell us what you found?

"A. Well, I drove up and Rosemary drove up immediately after me. I had some cookies for Mr. Vaught, and she was very angry I was there, I could tell, and I said, I was going to see Mr. Vaught, and I went down to the house, I had taken a look at some of the outside animals just before she drove up. I knocked, it took him a long time to come to the door, and he came to the door, and he was very unsteady. He was unshaven, he looked terribly ill. The house was worse than I could ever imagine, he said he had a backache, and he had fallen down, and I was concerned about him. I said, well, what have you had to eat, and he said, Rosemary hasn't taken me to the store for several days, and I have had nothing but bread and potato chips.

"Q. Did you have a conversation or did you call Mrs. Perry as a result of the visit?

"A. Well, I decided to call her concerning the animals, I decided instead of talking with her about Mr. Vaught, I would go to Mr. Vaught's attorney, Mr. McCrary, and tell him what I had found, and I thought it was so desperate if something wasn't done for Mr. Vaught, I thought he would die, I really thought he would. I told her about the animals, and I said, have you made any provisions for heat for these outside animals because she had a lot of Humane Society cages out there, and these animals, it was a miserable circumstance underfed cats. She said, that is none of your business, and if I set foot on this land again I will call the sheriff and have you put off."

Though the testimony of Mr. Vaught was taken February 14, 1980, the actual trial was not scheduled until Wednesday, July 23, 1980. Several days prior to the trial, Mr. Vaught was placed aboard a plane apparently by Debbie Perry, Ms. Perry's daughter. Mr. Vaught ended up in Dayton, Ohio, where one of his sisters resides. The sister was notified via a phone call that Mr. Vaught would be arriving at the airport within a couple of hours. She arranged to have one of her sons meet Mr. Vaught. When found at the airport in Dayton, Mr. Vaught was totally disoriented, without a suitcase, carrying no more than twenty dollars, and with no ticket home.

Ms. Perry was contacted within the next day or so. She indicated that Mr. Vaught should stay in Ohio for awhile, but that it would be all right for him to come back after Wednesday. No mention was made of the fact that was the date set for the trial. Fortunately Mr. Vaught's attorney located and arranged to have him back for the start of the trial.

The trial judge after rendering an excellent letter opinion, a part of the record, covering in some detail many of the facts heretofore outlined, entered findings of fact which amongst others included:

"4. * * * When Plaintiff signed the Deed, he was not freely, voluntarily, and intelligently conveying his property but was induced to sign as a result of the fraud, undue influence, duress, abuse of confidence, misrepresentations and other unconscionable conduct and questionable means of Defendant. He did not intend to convey his property to Defendant and was not aware of what he was signing. Both Plaintiff and Defendant knew that

the property was worth at least one million dollars. Approximately two years before, Plaintiff had rejected an offer by a third person to convey his property for $750,000.00.

"5. As of October 3, 1978, a confidential relationship existed between the parties. This afforded Defendant an opportunity to control Plaintiff, Plaintiff's condition was such as to permit subversion of his freedom of will, Defendant exercised activity in procuring the Deed and unduly profited as a result. There is clear proof of suspicious circumstances.

"6. By the means described, against equity and good conscience, Defendant obtained Plaintiff's property which she ought not hold and has been unjustly enriched."

 This has been but a brief recitation of a sordid story of avarice adduced at trial but its telling speaks loudly of a clear command that basic justice, if for no other reason, demanded relief for Mr. Vaught. We do not see any need to relate any further details. There was more than sufficient evidence to support the judgment of the trial court. In fact, we cannot see how the court could have arrived at any other conclusion. From the evidence, it is clear that Mr. Vaught was completely dependent upon Ms. Perry in whom he had misplaced his trust. He had sent his sister away and, as a result, had no relatives left in Casper. Further, Mr. Vaught was a crotchety and somewhat senile old man, too proud of his independence to recognize that he needed others, and perhaps most telling, desperate-ly lonely after his wife's death. As a result, like so many others of our elderly, he was easy prey for a master or even semi-master manipulator like Ms. Perry. But unlike many others, he was wealthy enough to have attracted the attention of others who were able to observe and report the utterly shameful way he was treated.[2]

 Because of Mr. Vaught's dependency upon Ms. Perry, there existed a confidential relationship. *Bergren v. Berggren*, 1957, 77 Wyo. 438, 317 P.2d 1101, 1107. The law of Wyoming is that when a transaction occurs between parties who are in a confidential relationship to each other, the courts will zealously scrutinize it. *Bergren*, supra. Accordingly, once a confidential relationship has been demonstrated, the burden then shifts to the recipient of the property to establish that the transaction was fair and conducted in good faith. *Brug v. Case*, Wyo. 1979, 600 P.2d 710; *Baldwin v. Birchby*, Wyo. 1959, 346 P.2d 278. Ms. Perry clearly failed to meet this burden and the evidence remains overwhelming that Mr. Vaught was overreached. There was unfairness and a complete absence of good faith in the transaction.[3]

 The other issue raised by Ms. Perry concerns the admissibility of evidence that she tried to prevent Mr. Vaught from attending the trial. Under Rule 404(b), W.R.E.,[4] evidence of other acts may be admitted for various purposes. One not listed specifically in the rule, but nonetheless recognized by this court, is course of conduct. *Hatheway v. State*, Wyo. 1981, 623 P.2d 741.

---

**2.** Every one of the witnesses who testified about Mr. Vaught's deplorable living conditions had tried at some point to buy his property.

**3.** Ms. Perry directs much of her argument to the proposition that evidence of Mr. Vaught's lack of sufficient mental and physical ability to legally execute the deed in question was not directed to the time of such execution, i. e., October 3, 1978. Such is the critical time to determine Mr. Vaught's mental capacity and presence or absence of undue influence by Ms. Perry. *In re Draper's Estate*, Wyo. 1962, 374 P.2d 425; *In re Merrill's Estate*, 1959, 80 Wyo. 276, 341 P.2d 506; *In re Estate of Carey*, Wyo. 1972, 504 P.2d 793.

Our holding is in accord. The testimony of previous and subsequent conduct was evidence from which the fact finder could gauge Mr. Vaught's mental capacity and the extent of Ms. Perry's influence over him as of October 3, 1978. It was so used.

**4.** Rule 404(b), W.R.E.:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

This case seems to be a classic example of what is meant by that term. Her attempt to thwart Mr. Vaught's chances of getting back his property by practically kidnapping him to prevent his trial appearance, though only one act in a long series of acts aimed at getting his property, is emphatically probative. It more than amply demonstrates the depths to which Ms. Perry sank in order to defraud a wealthy old man. There is no legitimate reason not to defer to the trial judge's determination of the evidence's admissibility. See *Hatheway,* supra. Thus, we hold the evidence admissible.

Pursuant to Rule 10.05, W.R.A.P., this court cannot certify that there was reasonable cause for the appeal and the clerk of this court is directed to tax, as part of the costs in the case, a fee of $500.00 to appellee's counsel and $1,000.00 as damages to appellee.[5]

Affirmed.[6]

---

5. Exhibit 20 in the record discloses a contract for sale by Mr. Vaught of all the lands embraced by this appeal to one Fred Hartnett for the sum of $1,000,000 effective upon the successful conclusion by Mr. Vaught of the underlying action and this appeal. There is no supersedeas bond. This award of damages is not intended to be in lieu of any other damages which may be recoverable by Mr. Vaught in any other action or by whatever means nor do we intend to suggest what, if any other means may be or are available. If Mr. Vaught's judgment in the district court had been for money instead of recovery of land, it would have been drawing interest at the rate of 10%. Section 1–16–102, W.S. 1977.

6. The court's judgment and decree in addition to cancellation of the deed gave judgment to Ms. Perry against Mr. Vaught for the money she had paid to him under the canceled deed, in the sum of $19,137.71. This restoration of funds paid is likewise affirmed.