2009 WY 53

**Joseph KRAFCZIK, Jr., Administrator of the Estate of Allan H. Krafczik, Appellant (Plaintiff),**

v.

**Tanaya Moon MORRIS, Appellee (Defendant).**

Nos. S–08–0003, S–08–0079.

Supreme Court of Wyoming.

April 13, 2009.

Representing Appellant: Steve C.M. Aron, Aron and Hennig, LLP, Laramie, Wyoming.

Representing Appellee: Stacy L. Rostad and Jason M. Tangeman, Anthony, Nicholas & Tangeman, LLC, Laramie, Wyoming. Argument by Mr. Tangeman.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1] In 2004, Allan Krafczik executed a Warranty Deed conveying to Tanaya Morris an interest in a rental property he owned in Laramie, Wyoming. The Warranty Deed established Mr. Krafczik and Ms. Morris as owners of undivided one-half interests as joint tenants with rights of survivorship. In late 2004, Mr. Krafczik's cousin, Joseph Krafczik, and his wife, Christine Krafczik, were appointed as guardians of Mr. Krafczik. The Krafcziks[1] filed suit on behalf of Mr. Krafczik against Ms. Morris, claiming that she had obtained the property interest through undue influence. After a bench trial, the district court ruled in favor of Ms. Morris. The Krafcziks appealed.

[¶ 2] While the litigation against Ms. Morris was pending, the Krafcziks executed a Quitclaim Deed on behalf of Mr. Krafczik, purporting to convey his joint tenancy in the property in exchange for a tenancy in common, with the express purpose of terminating rights of survivorship. The Krafcziks filed, in the conservatorship case, a motion for approval of that conveyance. Upon Mr. Krafczik's death, the district court dismissed their motion. The Krafcziks also appealed that decision, and the appeals were consolidated before this Court. We will affirm the district court in both cases.

## ISSUES

[¶ 3] In the appeal of the adverse judgment on their claim of undue influence, the Krafcziks state these issues for our consideration:

1. On a claim of undue influence concerning an elderly landlord with Alzheimer's disease who deeds his family home to the renter of the property, did the trial court abuse its discretion in failing to find a confidential relationship between the parties?

2. Whether the trial court then abused its discretion in determining after trial that a confidential relationship did not exist between landlord and renter, where at the close of Plaintiffs' case the court had held that such relationship existed, and where Defendant presented no evidence to rebut the court's initial finding.

In the appeal in the conservatorship matter, the parties suggest a number of different issues. This one, somewhat reworded, is dispositive:

3. Whether a conservator requires court approval to convey the real property of the ward in order to sever a joint tenancy and eliminate rights of survivorship.

## FACTS

[¶ 4] Allan Krafczik and his wife Kathy lived in Laramie, Wyoming, for many years. They had no children or other close family, but they were active in their community and had many friends and acquaintances. They owned their home, and also a rental property

---

1. We will continue referring to Allan Krafczik as Mr. Krafczik, and to Joseph and Christine Krafczik collectively as the Krafcziks. Adding further confusion, the appeals are no longer being pursued by Joseph and Christine Krafczik as Mr. Krafczik's conservators, but following Mr. Krafczik's death, by Joseph Krafczik as administrator of his estate. To avoid confusion, however, we will continue to refer to the Appellant as the Krafcziks.

in Laramie, referred to as the Bradley Street Property. Located on the Bradley Street Property was a house that had been built by Mr. Krafczik's father, along with a smaller apartment that connected to the main house through a common utility room. In 1998, the main house on the Bradley Street Property was leased to Tanaya Morris and her sister Lay-nah,[2] who were both students at the university.

[¶ 5] After his wife passed away in early 1999, Mr. Krafczik developed a closer friendship with the Morris sisters. Tanaya Morris testified that she and Mr. Krafczik would talk often, see each other at least once a week, occasionally have meals together, and exchange holiday gifts. Near the end of 2003, Mr. Krafczik began asking Ms. Morris about her long-term plans, and in particular whether she intended to stay in Laramie. She told him that she expected to stay in Laramie at least until she completed her graduate degree, but was uncertain what she would do after that. In early 2004, Mr. Krafczik asked Ms. Morris if she would be "willing to take responsibility" for the Bradley Street Property "at some point in time." She said no, apparently in part because she was not certain what he meant.

[¶ 6] In May of 2004, Mr. Krafczik went to Ms. Morris's office and asked for her help in preparing a document he called a "Lease to Own Purchase Agreement." In general terms, the agreement provided that Ms. Morris would continue to rent the Bradley Street Property until Mr. Krafczik's death, and after that she would own the Bradley Street Property. She was surprised, and initially objected. He assured her that he appreciated the way she took care of his father's house, and liked the fact that she had left some of his mother's pictures in place. She agreed to prepare the document as he requested. It was signed by Mr. Krafczik and Ms. Morris on May 28, 2004.

[¶ 7] A few days later, Mr. Krafczik invited Ms. Morris to his home one evening. When she got there, he gave her a pad of paper, and asked her to walk through the house with him and take notes about what he wanted done with his personal property after his death. Ms. Morris suggested that it would be better if Mr. Krafczik engaged a lawyer to prepare his will. He asked if she knew one, and she suggested a lawyer in Cheyenne who had once been her college roommate.

[¶ 8] Ms. Morris was at Mr. Krafczik's home again the following week, when he mentioned a collection of photographs that he wanted to donate to a museum upon his death. Ms. Morris again suggested that he needed a lawyer to help him accomplish that, and he agreed to get the lawyer on the telephone. Ms. Morris spoke to the lawyer first to introduce Mr. Krafczik. Ms. Morris then left the room, went into the kitchen, and busied herself by washing up some dishes. She did not hear any of the conversation between Mr. Krafczik and the lawyer.

[¶ 9] A short time later, Ms. Morris received a fax from the lawyer, which included copies of a will, a living will, and two warranty deeds.[3] The will had been drafted to devise and bequeath Mr. Krafczik's entire estate to Ms. Morris. The living will had been drafted to designate Ms. Morris to make medical treatment decisions for Mr. Krafczik if he became incapacitated. The two warranty deeds had been drafted to convey Mr. Krafczik's home and the Bradley Street Property to Mr. Krafczik and Ms. Morris as joint tenants with rights of survivorship. Ms. Morris was surprised by these documents, and "very uncomfortable" with them. After work, she went to Mr. Krafczik's home to talk to him about the documents. He confirmed that he had asked the lawyer to draft the documents for his consideration, but noted that he could choose whether to sign them or not.

[¶ 10] On June 22, 2004, Mr. Krafczik called Ms. Morris at work and asked her to go to lunch. Over lunch, Mr. Krafczik

---

2. Although the lease was signed only by Lay-nah Morris, it appears undisputed that both sisters lived in the house, and each paid a portion of the rent. Lay-nah Morris is not a party in these appeals.

3. According to the lawyer's testimony, she mailed the original documents to Mr. Krafczik and, at his instruction, faxed copies to Ms. Morris. The record does not establish whether Mr. Krafczik received the mailed originals.

showed her the Warranty Deed for the Bradley Street Property, and said "We're going to do this today." After some discussion, she insisted that the least she could do was to pay the attorney's fees for preparing the documents. Eventually, Mr. Krafczik asked if she knew where to get the Warranty Deed notarized, and Ms. Morris said there was a notary at the university police station. She took him there, where he signed the warranty deed, had it notarized, and gave it to Ms. Morris. Ms. Morris filed the deed with the County Clerk's office on July 7, 2004.

[¶ 11] When Ms. Morris tried to pay rent to Mr. Krafczik after he had signed the Warranty Deed, he refused her offer of payment. He said, "We're done with that. We took care of that." She later made some payments they called "rent," but which she intended as reimbursements to Mr. Krafczik for taxes and insurance on the Bradley Street Property.

[¶ 12] Mr. Krafczik had a cousin, Joseph Krafczik, who lived in Laramie with his wife Christine Krafczik. The Krafcziks' relationship with Mr. Krafczik was cordial but not close. In October of 2004, the Krafcziks received a call from John Henberg, a longtime acquaintance of Mr. Krafczik. Mr. Henberg had gone to Mr. Krafczik's home to borrow a camera. He found the house uncharacteristically cluttered, and thought Mr. Krafczik seemed confused and forgetful. Mr. Henberg had experience with members of his own family who had suffered dementia, and he became concerned for Mr. Krafczik. He called the Krafcziks to express his concern.

[¶ 13] The Krafcziks went to Mr. Krafczik's house that same night, and found the house "really in disarray," with "papers and bills and newspapers and things just spread all over." They found unpaid bills and overdue notices. When they offered assistance in bringing the bills up to date, Mr. Krafczik agreed that he could use some help. With the advice of a lawyer in Laramie, they set up a voluntary conservatorship, with the Krafcziks acting as conservators for Mr. Krafczik. In addition to helping Mr. Krafczik with his bills, the Krafcziks helped him with medical matters. In late 2004, Mr. Krafczik was diagnosed as suffering from Alzheimer's disease.

[¶ 14] Among Mr. Krafczik's papers, the Krafcziks discovered the "Lease to Own Purchase Agreement" for the Bradley Street Property. When they asked Mr. Krafczik what it was, he told them he did not know, and denied that he had signed the document. The Krafcziks later discovered the Warranty Deed conveying the Bradley Street Property to Mr. Krafczik and Ms. Morris as joint tenants with rights of survivorship. Mr. Krafczik also said he had not signed that document. The Krafcziks also acquired copies of the will, the living will, and the Warranty Deed for Mr. Krafczik's home. These three documents were, apparently, unsigned.

[¶ 15] On June 9, 2005, the Krafcziks, as Mr. Krafczik's conservators, filed suit against Ms. Morris, claiming that she had obtained her interest in the Bradley Street Property through undue influence. A three-day bench trial began on August 20, 2007. The district court ruled in favor of Ms. Morris, entering its judgment on October 3, 2007. The Krafcziks appealed from that judgment, bringing the first of these two consolidated cases before us.

[¶ 16] While the litigation was pending before the district court, the Krafcziks continued acting as Mr. Krafczik's conservators. On September 6, 2005, the Krafcziks executed a Quitclaim Deed on behalf of Mr. Krafczik purporting to convey his joint tenancy interest in the Bradley Street Property back to himself as a tenancy in common. The document stated that the conveyance was "for the express purpose of terminating any joint tenancy with right of survivorship which may exist with regard to the property." Put another way, they meant to terminate Ms. Morris's right of survivorship so that, in the event of Mr. Krafczik's death, his half interest in the property would pass to his estate rather than to Ms. Morris.

[¶ 17] On July 21, 2006, the Krafcziks filed in the separate conservatorship matter a petition seeking the court's approval of the Quitclaim Deed and its transformation of Mr. Krafczik's joint tenancy into a tenancy in common. Ms. Morris filed an objection.

The district court took no action on this petition, but the Krafcziks filed a subsequent motion on December 21, 2007. Ms. Morris again objected. The district court held a hearing on the matter on February 5, 2008. Mr. Krafczik died on February 16, 2008, before the district court issued a decision in the matter. The district court then dismissed the motion as moot, further stating in its order that the death of Mr. Krafczik "caused the vesting of Ms. Morris' joint tenancy with rights of survivorship." In other words, the district court determined that Ms. Morris, as the survivor, was the sole owner of the Bradley Street Property. The Krafcziks appealed from that decision, bringing the second of the two consolidated cases for our review.

### STANDARD OF REVIEW

[¶ 18] "We review findings of fact made by the district court after a bench trial using a clearly erroneous standard." *Campbell County School Dist. v. State*, 2008 WY 2, ¶ 10, 181 P.3d 43, 49 (Wyo.2008). A district court's findings are not entitled to the same degree of deference afforded a jury verdict. Accordingly, we do not limit our review solely to the evidence favoring the prevailing party, but instead consider all of the admissible evidence contained in the record. Still, a district court's findings are presumed correct, and we give due regard to the fact that the district court had an opportunity to assess the credibility of the witnesses and to weigh the disputed evidence. We set aside a district court's findings only if they are clearly erroneous. *Addison v. Dallarosa–Handrich*, 2007 WY 110, ¶ 8, 161 P.3d 1089, 1091 (Wyo.2007). "A finding is clearly erroneous when, even though substantial evidence supports it, the reviewing court is left with the definite and firm conviction that a mistake was made." *Campbell County*, ¶ 10, 181 P.3d at 49.

[¶ 19] The dispositive issue in the Krafcziks' appeal in the conservatorship matter is whether Wyo. Stat. Ann. § 3–3–607(a) (LexisNexis 2007) required the Krafcziks to obtain the district court's approval for the conveyance of Mr. Krafczik's joint tenancy in exchange for a tenancy in common. "Statu-

tory interpretation is a question of law, so our review is *de novo*." *Qwest Corp. v. Public Service Comm'n*, 2007 WY 97, ¶ 3, 161 P.3d 495, 497 (Wyo.2007).

### DISCUSSION

#### 1. Undue influence

[¶ 20] In their brief, the Krafcziks concede that the issue "of whether there was a confidential relationship between Allan Krafczik and Tanaya Morris is dispositive of this appeal." In its decision letter following the bench trial, the district court recited that

> Courts carefully scrutinize deed transactions when the parties involved have a confidential relationship with one another. *Short v. Hall*, 785 P.2d 1167, 1170 (Wyo. 1990). Once the person who is seeking to void the transaction on the basis of undue influence has established that a confidential relationship existed between the grantor and the grantee, the burden of proof shifts to the recipient of the property to prove that the transaction was fair and conducted in good faith. *Walsh [v. Walsh]*, 841 P.2d [831,] 834 [(Wyo.1992)]; *Short*, 785 P.2d at 1170.
>
> *Marchant v. Cook*, 967 P.2d 551, 557 (Wyo. 1998).

The Krafcziks assert that the evidence introduced during the bench trial established the existence of a confidential relationship between Mr. Krafczik and Ms. Morris. On that basis, the Krafcziks claim that the district court erred in failing to shift the burden of proof and not requiring Ms. Morris to prove that the "Lease to Own Purchase Agreement" and the Warranty Deed represented fair, good faith transactions.

[¶ 21] In the current case, the district court provided a thorough and thoughtful analysis of this issue. The following quotation from the district court's decision letter is lengthy, but it contains a useful summary of the evidence adduced at trial.

> First, the Court must address whether Morris and Krafczik had a confidential relationship, as this condition would serve to shift the burden of proof to Morris. A confidential relationship is defined as "ei-

ther one person under the domination of another or one who is justified, by virtue of his relation with another, in assuming that the other will not act inconsistently with his or her welfare." 25 Am.Jur.2d *Duress and Undue Influence* § 39. *See also Perry v. Vaught*, 624 P.2d 776, 783 (Wyo.1981); *Johnson v. Soulis*, 542 P.2d 867, 874 (Wyo. 1975). Factors that may be considered in determining the existence of a confidential relationship include: (1) the victim's advanced age, physical or mental debility or weakness, or dependence on the dominant party, (2) whether the individuals maintain a close relationship, and (3) whether there is a power of attorney between the individuals. *Id.* In Wyoming, for example, parties have been determined to have a confidential relationship where one individual is dependent upon the other to some degree. *See Perry* [, 624 P.2d at 778] (where Vaught's physical ailments reduced his ability to fend for himself such that Perry began providing transportation and other sundry services including grocery shopping and bill paying.).

Here, Krafczik was an elderly gentleman whose wife had died a few years before the events in question. Additionally, Krafczik may have been suffering the early effects of Alzheimer's disease during the period in question although the extent of its effects is disputed. Further, in addition to being landlord and tenant, Morris and Krafczik had a close, familial relationship. They exchanged gifts, dined together, and spent leisure time together. Morris, at the least, prepared the "Lease to Own Purchase Agreement" and she provided Krafczik with the contact information for [the lawyer in Cheyenne] and introduced them, resulting in the *Warranty Deed.* The evidence suggests that Morris had contact with Krafczik several times a week. She continues to visit with him on the phone despite his being transferred to Fort Collins. Additionally, Morris washed Krafczik's dishes on at least one documented occasion and filled out one of Krafczik's personal checks at his request. These acts indicate, at a minimum, a trusting friendship between Morris and Krafczik.

However, there are factors that preclude this Court from finding that a confidential relationship existed. Trial testimony indicates that Krafczik was an independent man in good physical shape. He was not dependent upon Morris in completing any of his daily activities. Outside of the single dishwashing episode that occurred while Krafczik talked on the telephone with [the lawyer from Cheyenne], Morris did not perform any chores for Krafczik. . . .

Trial testimony indicated that Krafczik was not dependent upon Morris in completing any daily activities. He had no trouble caring for himself on a daily basis. He could feed and clothe himself, and he was quite mobile. Krafczik had many friends and acquaintances, including the Young family to whom he was very close. In short, Krafczik had many people around him to depend upon, but never became truly dependent on any of them.

Trial testimony established that Krafczik kept a strict watch on and orderly control over his financial affairs prior to being diagnosed with Alzheimer's and during the disease's earlier stages. Even after the debilitating disease began affecting Krafczik to a greater degree, he did not depend upon anyone else to control his finances. Instead, he simply forgot about or ignored his financial obligations. His bills were not paid on a regular basis and some of his services were interrupted. Clearly, Krafczik never relied upon anyone else to control his financial affairs. The Court also notes that Morris never had power of attorney on behalf of Krafczik.

Additionally, other facts in this case suggest that a confidential or fiduciary relationship did not exist between Morris and Krafczik. Documents prepared by [the Cheyenne lawyer], including the *Last Will and Testament* and *Declaration of Living Will*, provided Krafczik the opportunity to assign a substantial amount of control over his personal affairs to Morris. The proposed *Last Will* named Morris as the executrix and the proposed *Living Will* designated Morris to make treatment decisions for Krafczik. However, Krafczik never signed or executed either of these docu-

ments, executing only the *Warranty Deed* currently at issue....

In *Johnson v. Reiger*, 2004 WY 83, 93 P.3d 992 (Wyo.2004), the Wyoming Supreme Court examined several factors in finding an inference that a confidential relationship existed. There, the conveyance was originally suggested by the grantee. *Id.* at ¶ 19, 93 P.3d at 997. Here, both agreements that transferred an interest to Morris were initiated by Krafczik, and there is no evidence by which this Court could find that Morris ever suggested any conveyance at all. There, the grantee had an agenda prepared for the meetings with the grantor's lawyer and accountant which was adhered to and the grantor "received pressure" from the grantee to execute the conveyance. *Id.* at ¶ 17, 93 P.3d at 997. Here, Morris took no part in Krafczik's discussion with [the lawyer] and testified that she never knew of Krafczik's intent to deed the Property to her until she received the fax indicating such.... Additionally, the Notary testified that Krafczik did not appear to be under any pressure when he signed the deed, and there was no testimony that Morris did anything at that time. There, the grantor specifically depended upon the grantees to manage her financial affairs. *Id.* at ¶ 15, 93 P.3d at 997. Here, Morris never managed Krafczik's affairs. Instead, when Krafczik became unable to manage his own affairs, nobody tended to them.

In sum, the Court finds that Morris and Krafczik shared a close friendship that was just that—a close friendship, developed over several years. Krafczik was elderly and suffered from a terrible disease that progressively robbed him of his mental acuity. However, this friendship did not give rise to a confidential or fiduciary relationship between Morris and Krafczik. A fiduciary duty "derives from the conduct or undertaking of the purported fiduciary." *Lee v. LPP Mortgage Ltd.*, 2003 WY 92, ¶ 25, 74 P.3d 152, 162 (Wyo.2003). Here, Morris conducted herself as a friend to Krafczik and he reciprocated. However, Krafczik did not rely upon Morris to control his daily activities or his personal affairs, and Morris never undertook such control. Krafczik conducted his affairs independent from his friends, even beyond the point where he could have benefited from their assistance.

Finding no confidential relationship between the parties, the burden does not shift to Morris to present evidence that the conveyance was fair and conducted in good faith. The burden remains upon the Krafczik[s] to establish the three elements of undue influence by preponderance of the evidence.

[¶ 22] The Krafcziks do not take issue with the district court's legal analysis. They claim only that its factual findings were contrary to the evidence. Applying our standard of review, we consider all of the admissible evidence of record to determine whether the district court's findings are clearly erroneous.

[¶ 23] The first factor listed by the district court was the victim's debility or dependence on the dominant party. Put another way, the district court must ask whether Mr. Krafczik's "condition was such as to permit subversion of his freedom of will." *Brug v. Case*, 600 P.2d 710, 715 (Wyo.1979), quoting *In re Draper's Estate*, 374 P.2d 425, 430–31 (Wyo.1962). The record does contain evidence supporting the Krafcziks' position that Alzheimer's disease may have diminished Mr. Krafczik's mental abilities. Several witnesses testified that, as early as the fall of 2002, Mr. Krafczik sometimes seemed confused, unable to answer simple questions, and unable to make decisions. Some testified that Mr. Krafczik seemed uncharacteristically malleable, and less willing or able to express his own opinions. There is also evidence that Mr. Krafczik later denied signing the Warranty Deed, and may not have understood that the document conveyed the property interest to Ms. Morris.

[¶ 24] But there is also evidence indicating that, at other times, Mr. Krafczik did not exhibit diminished mental capacity. As one example, the Laramie lawyer testified that the Krafcziks first consulted him about an involuntary conservatorship. After meeting with Mr. Krafczik, however, the lawyer believed that Mr. Krafczik was competent and

capable of cooperating in a voluntary conservatorship. Later, when Mr. Krafczik signed a revocation of prior wills, the lawyer felt that Mr. Krafczik understood the document, and that he demonstrated sufficient testamentary intent to revoke his prior wills. Significantly, while other witnesses observed that Mr. Krafczik sometimes appeared malleable and suggestible, this lawyer noted that when Mr. Krafczik first reviewed the will revocation document, he said he wanted to think about it, and did not sign the document until the following day.

[¶ 25] As the district court stated, the record contains conflicting evidence regarding the effect of Alzheimer's disease on Mr. Krafczik's mental abilities. There is, however, very little evidence that this condition left him dependent upon Ms. Morris. In contrast, there is substantial evidence to support the trial court's findings that Mr. Krafczik did not depend upon Ms. Morris in completing his daily activities, controlling his financial affairs, or managing his personal affairs. We find no basis for concluding that the district court's findings are clearly erroneous.

■ [¶ 26] With regard to their relationship, it seems undisputed, and the district court found, that there was "a trusting friendship" between Mr. Krafczik and Ms. Morris. However, friendship is not the kind of relationship that necessarily indicates the existence of a confidential relationship. *Compare Walsh v. Walsh*, 841 P.2d 831, 835 (Wyo.1992) (the existence of a family relationship is not enough to establish a confidential relationship). To establish a confidential relationship, it is necessary to demonstrate a relationship that afforded the dominant party an opportunity to control the victim. *Brug*, 600 P.2d at 715; *Draper*, 374 P.2d at 430–31. There is little evidence in the record of a controlling relationship between Ms. Morris and Mr. Krafczik, while there is ample evidence supporting the district court's findings that Ms. Morris never undertook to control Mr. Krafczik. Most telling, we think, is testimony from the person who notarized the Warranty Deed by which Mr. Krafczik conveyed an interest in the Bradley Street Property to Ms. Morris. The notary provided these observations:

Q. Did Mr. Krafczik seem confused to you?

A. No, not at all.

Q. Did he seem disorientated [sic]?

A. No. He seemed to know exactly what he was doing.

Q. Did he seem to be fully relying upon the young lady that was with him?

A. Not at all. Huh-uh.

Q. Was she assisting him in any way, to your recollection?

A. No. She just stood there while I was working with him.

Q. Did he seem to be relying upon her in any way?

A. Not that I'm aware of.

Q. Did it look like he—she was controlling his actions in any way?

A. No, huh-uh.

Q. If some of those things or all of those things were present, would you have notarized the document?

A. Absolutely not.

Q. And why not?

A. Well, in notarizing something, a person who is signing it has to be aware of what they are doing.

■ [¶ 27] In sum, the record contains evidence that could support the existence of a confidential relationship between Mr. Krafczik and Ms. Morris, and it contains evidence to the contrary. The lengthy quotation from the district court's decision letter demonstrates the care with which the district court considered and weighed the evidence, and we do not engage in re-weighing. *Addison*, ¶ 8, 161 P.3d at 1091. Our review of the record does not leave a definite and firm conviction that the district court made a mistake, and so we cannot conclude that the district court's findings are clearly erroneous. We affirm the district court's decision.

### 2. *Motion at the close of plaintiffs' case*

■ [¶ 28] After the Krafcziks presented their case in chief during the bench trial, Ms. Morris made a motion for judg-

ment on partial findings,[4] arguing in essence that the evidence produced by the Krafcziks was insufficient as a matter of law to establish the existence of a confidential relationship between Mr. Krafczik and Ms. Morris. The district court denied the motion, with this explanation:

> In considering a motion like this, the Court is required to consider the evidence that's been submitted, essentially, as true; to accept that in the light most favorable to the plaintiff at this point, at least. . . .
>
> There probably is no single thing here that establishes a confidential relationship, but there are a lot of little things that, taken together, at least in the light most favorable to the plaintiff at this point, could cause the Court to conclude that there was, in fact, a confidential relationship here; that they had a relationship where Mr. Krafczik clearly trusted Ms. Morris to do things on his behalf and to act in his best interest. . . .
>
> But, as I say, I'm required to consider this evidence in the light most favorable to plaintiff at this point. That being the case, I do think the plaintiff has at least had evidence sufficient to provide the prima fa[cie] case. For the record, the motion is denied.

[¶ 29] On appeal, the Krafcziks argue that because the district court concluded that a confidential relationship existed at the close of the Krafcziks' case, it could not then rule that the relationship did not exist at the close of Ms. Morris's case. However, at the close of the Krafcziks' case, the district court did not conclude that a confidential relationship existed. It concluded only that the Krafcziks had presented sufficient evidence of a confidential relationship to survive Ms. Morris's motion for judgment on partial findings. Moreover, as the district court correctly indi-

cated, it was required at that point to consider the evidence in the light most favorable to the Krafcziks, affording them all favorable and reasonable inferences. *See Wilkinson v. State ex rel. Wyoming Workers' Safety & Comp. Div.,* 991 P.2d 1228, 1240 (Wyo.1999); *True Oil Co. v. Sinclair Oil Corp.,* 771 P.2d 781, 795 (Wyo.1989). The district court's decision to deny the motion was fully consistent with prior guidance from this Court:

> Where plaintiff's proof has failed in some aspect the motion should, of course, be granted. Where plaintiff's proof is overwhelming, application of the rule is made easy and the motion should be denied. But where plaintiff has presented a *prima facie* case based on unimpeached evidence we are of the opinion that the trial judge should not grant the motion even though he is the trier of the facts and may not himself feel at that point in the trial that the plaintiff has sustained his burden of proof.

*Angus Hunt Ranch, Inc. v. Reb, Inc.,* 577 P.2d 645, 648 (Wyo.1978) (emphasis and punctuation omitted).

[¶ 30] At the close of Ms. Morris's case, however, the district court was no longer required to view the evidence in the light most favorable to the Krafcziks. It was required to weigh all of the evidence impartially, including the evidence introduced by Ms. Morris on the question of whether there was a confidential relationship. When the district court did so, it found the Krafcziks' evidence less compelling than Ms. Morris's. There is no merit in the contention that the district court's ruling in the Krafcziks' favor at the close of their case somehow obligated it to decide the case in their favor at the end of the trial.

---

**4.** The trial transcript reflects confusion about the proper name for this motion. Counsel for Ms. Morris stated that a motion for "directed verdict is not appropriate." That is correct for two reasons. First, amendments to the rules of civil procedure have replaced the old term "directed verdict" with the new term "judgment as a matter of law." W.R.C.P. 50(a). Second, a motion for judgment as a matter of law is allowed only "during a trial by jury." W.R.C.P. 50(a); *See* Wright & Miller, *Federal Practice and Procedure* Civil 3d § 2521, at 222–23 and § 2523, at 229–31 (2008). Counsel for Ms. Morris instead asked to renew a motion for summary judgment. The motion a defendant makes at the close of a plaintiff's case during a bench trial is a motion for "judgment on partial findings." W.R.C.P. 52(c). Such confusion is apparently common, and when "the movant uses the wrong name, this defect should be disregarded." Wright & Miller, *supra,* § 2523, at 231.

### 3. Court approval of a conservator's property conveyance

[¶ 31]   As noted above, the Warranty Deed executed by Mr. Krafczik conveyed the Bradley Street Property to himself and Ms. Morris as joint tenants with rights of survivorship.  The Krafcziks, as his conservators, later executed a Quitclaim Deed by which they attempted to convey Mr. Krafczik's joint tenancy to himself as a tenancy in common, in an effort to destroy Ms. Morris's right of survivorship.  It is undisputed that the Krafcziks did not receive approval of this transaction from the district court.  The dispositive question here is whether court approval was required.[5]

[¶ 32]   In Wyoming, the duties and powers of a conservator are established by statute.  Wyo. Stat. Ann. §§ 3–3–601 through –611.  In this case, we must determine whether the Krafcziks' actions fall within Wyo. Stat. Ann. § 3–3–606—powers a conservator may exercise without court approval—or Wyo. Stat. Ann. § 3–3–607—powers a conservator may exercise only with court approval.

[¶ 33]   Wyo. Stat. Ann. § 3–3–606, in relevant part, provides as follows:

(a) Without prior order of the court the conservator may:

. . .

(ii) Enforce, defend against or prosecute any claim by or against the ward or the conservator;

(iii) Sue on and defend claims in favor of or against the ward or the conservator;

(iv) Sell and transfer personal property of a perishable nature and personal property for which there is a regularly established market;

. . .

(vi) Receive additional property from any source;

. . .

(xi) Appear for and represent the ward in all legal proceedings, unless another person is appointed for that purpose, and prosecute or defend actions, claims or proceedings in any jurisdiction for the protection of estate assets and of the conservator in the performance of his duties;

[¶ 34]   On appeal, the Krafcziks assert that they did not need court approval to execute the Quitclaim Deed because their action amounted to prosecuting a claim by the ward, defending claims against the ward, and prosecuting claims for the protection of estate assets.  This assertion ignores the fact that the Krafcziks were prosecuting Mr. Krafczik's claim in separate litigation against Ms. Morris.  The Quitclaim Deed was not executed as part of the litigation against Ms. Morris, but as an independent act intended to terminate Ms. Morris's right of survivorship regardless of the outcome of the litigation.  The execution of the Quitclaim Deed was not an act furthering the prosecution or defense of any claim.

[¶ 35]   The Krafcziks also rely on subsection (vi) of the quoted statute, which allows a conservator to receive property from any source.  It may be true that, if the Quitclaim Deed was effective, they would have received a tenancy in common.  The statute allows a conservator to receive personal or real property without court approval.  It is equally true, however, that if the Quitclaim Deed was effective, they would have conveyed the joint tenancy.  The statute allows a conservator to sell and transfer personal property without court approval under specified circumstances.  The statute says nothing about conveying real property without court approval.  The Krafcziks' execution of the Quitclaim Deed does not fall within the list of powers a conservator may exercise without court approval.

[¶ 36]   Wyo. Stat. Ann. § 3–3–607, in relevant part, provides as follows:

(a) Upon order of the court after hearing and notice as prescribed by the court the conservator may:

. . .

---

5.  In their briefs, as before the district court, the parties disputed whether a joint tenant may extinguish the joint tenancy and terminate rights of survivorship by a unilateral exchange of his joint tenancy for a tenancy in common.  Because we find dispositive the question of whether the transaction required the district court's approval, we need not resolve that dispute in this case.

(v) Sell, mortgage, exchange, pledge or lease real and personal property belonging to the ward, including the homestead and exempt personal property when it appears to be in the best interest of the ward, in the same manner and by the same procedure provided by title 2, Wyoming statutes for the sale, mortgage, exchange, pledge and lease by personal representatives in administration of estates of decedents;

[¶ 37] The Krafcziks maintain that they are not subject to this provision because they did not "[s]ell, mortgage, exchange, pledge, or lease" any real property belonging to Mr. Krafczik. It is undisputed that they did not mortgage, pledge, or lease the property, and it seems apparent that they did not.

[¶ 38] It is not so readily apparent that they did not exchange or sell the property. An exchange generally involves the "transfer of property other than for money" or a "[t]ransaction in which one piece of property ... is given in return for another piece of property." *Black's Law Dictionary* 562 (6th ed.1990). The Krafcziks gave one piece of property, the joint tenancy, in return for another piece of property, the tenancy in common. The transaction they attempted fits the common definition of an exchange. A sale generally involves the transfer of property in exchange for valuable consideration. *Id.* at 1360. By executing the Quitclaim Deed, the Krafcziks purported to transfer Mr. Krafczik's joint tenancy in exchange for the valuable consideration of a tenancy in common, an action that seems to fit the common definition of a sale.

[¶ 39] In the context of this statute, it may well be that the terms "sell" and "exchange" should be given more particularized definitions. The statute provides no such definitions, however, and neither the Krafcziks nor Ms. Morris has provided legal authority for any alternative definitions. Within the limitations of this case, we must rely on the general definitions. We therefore conclude that the Krafcziks sold the real property or exchanged it, or both, and that such actions required court approval.

[¶ 40] The parties also provided no authority as to the legal effect of a purported conveyance for which court approval is required but not obtained. The general rule seems to be that such a conveyance is void, though some courts have said that it is merely voidable. 39 C.J.S. *Guardian and Ward* §§ 128, 132 (2008). One Wyoming case suggests that the distinction may depend upon whether the transaction occurred before or after the ward has been adjudicated incompetent. *First Interstate Bank of Sheridan v. First Wyoming Bank, N.A. Sheridan,* 762 P.2d 379, 382 (Wyo.1988). Applying this rule would require facts more detailed than those presented to us in this record.

[¶ 41] Another general authority avoids the distinction between void and voidable, and instead explains that

[a] guardian's sale of real property may be incomplete unless the sale is confirmed by the court having jurisdiction over the proceeding. Where the ward dies before the confirmation of the sale, confirmation is no longer possible since title to the property vests in the ward's heirs and devisees; therefore, a sale conducted in such a situation is invalid, as is an order confirming such a sale.

39 Am.Jur.2d *Guardian and Ward* § 145, at 131 (2008) (footnotes omitted). Among the authorities cited for the first quoted sentence is *In re Guardianship of Hilton's Estate,* 72 Wyo. 389, 265 P.2d 747 (1954).

[¶ 42] The situation described in this quotation is remarkably similar to the situation presented in the current case, and we, too, will avoid exploration of the fine distinction between void and voidable. The Krafcziks executed the Quitclaim Deed prior to obtaining court approval. Mr. Krafczik died before the district court confirmed the sale. Approval of the conveyance was no longer possible, because Ms. Morris, as a joint tenant with right of survivorship, immediately succeeded to Mr. Krafczik's interest in the Bradley Street Property. In the particular circumstances presented by this case, the Quitclaim Deed represented an incomplete conveyance. On that basis, we affirm the district court's ruling that Mr. Krafczik's interest in the property vested in Ms. Morris upon his death.

[¶ 43] The two consolidated cases are both affirmed.